UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE HUMANE SOCIETY OF THE UNITED STATES
1255 23rd St., NW
Suite 450
Washington, DC 20037

Civil Action No. _____

THE HUMANE SOCIETY LEGISLATIVE FUND
1255 23rd St., NW
Suite 455
Washington, DC 20037

**Complaint for Declaratory and Injunctive Relief**

PAULINE STOTSENBERG
40836 Calle Bandido
Murrieta, CA 92562

JANA BABUSZCZAK
31015 Becky Ln.
Magnolia, TX 77354

WILLIAM COON
7876 W. Canyon Rd.
Herriman, UT 84096

KRISTI QUAINTANCE
48337 253rd St.
Garretson, SD 57030

*Plaintiffs,*

v.

THE UNITED STATES DEPARTMENT OF
AGRICULTURE,
1400 Independence Ave., SW
Washington, DC 20250

THE ANIMAL AND PLANT HEALTH INSPECTION
SERVICE,
4700 River Rd.
Riverdale, MD 20737

THE OFFICE OF THE FEDERAL REGISTER
8601 Adelphi Rd.
College Park, MD 20740

SONNY PERDUE, in his official capacity as
Secretary of the United States Department of
Agriculture,
1400 Independence Ave., SW
Washington, DC 20250

KEVIN SHEA, in his official capacity as
Administrator of the Animal and Plant Health
Inspection Service,
4700 River Rd.,
Riverdale, MD 20737

OLIVER POTTS, in his official capacity as Director
of the Office of the Federal Register,
8601 Adelphi Rd.
College Park, MD 20740

*Defendants.*

## INTRODUCTION

1.     The Animal and Plant Health Inspection Service ("APHIS") and the United States Department of Agriculture ("USDA") have unlawfully repealed a final rule duly issued, prescribed or promulgated to achieve the statutory mandate of the Horse Protection Act of 1970 and its 1976 amendments (the "HPA" or the "Act," codified at 15 U.S.C. § 1821 *et seq.*)—*viz*, to end the cruel and inhuman practice of "horse soring" whereby devices, equipment and foreign substances are used to inflict pain on a horse's limbs and feet in order to provoke a high-stepping gait prized among some Tennessee Walking Horse and racking horse exhibitors.  Specifically, "Action: Final Rule Horse Protection; Licensing of Designated Qualified Persons and Other Amendments," attached as Exhibit A, (hereinafter "the Final Rule") would have replaced the wholly inadequate existing regulatory scheme that has failed to end horse soring.[1]  The Final Rule was duly issued, prescribed or promulgated because it had been (a) signed by the responsible USDA official; (b) sent to the Office of Federal Register ("OFR") for publication; (c) published in full decisional text form on USDA's website with an effective date; (d) publicized in a USDA press release; and (e) placed on public inspection by OFR and scheduled for publication.  As a result, the Final Rule was "valid as against" all persons under the Federal Register Act ("FRA") and duly issued, prescribed or promulgated under the Administrative Procedure Act ("APA"), and could not be repealed without public notice first proposing such repeal, explaining the rationale for it and providing the opportunity for public comment.  Moreover, such repeal constitutes a clear and abrupt reversal of the legal, policy and factual findings by USDA and APHIS that necessitated the adoption of the

---

[1] Exhibit A is the publicly-available document currently posted on the APHIS website, https://www.aphis.usda.gov/newsroom/federal_register/hpa-rule.pdf, bearing the electronic signature of the authorized agent of USDA, Mr. David Howard.  Attached as Exhibit B is a version produced by APHIS's Animal Care program office in response to a Freedom of Information Act (FOIA) request, bearing the manual signature of Mr. Howard.

Final Rule without any explanation whatsoever to support that reversal; as a matter of law, therefore, such repeal was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  Because the Final Rule is necessary to achieve the HPA's statutory mandate to end "horse soring," its repeal also violates the HPA.

2.     There can be no dispute that the U.S. Congress enacted the HPA to end horse soring. 15 U.S.C. § 1824.  The HPA declares an array of conduct used for horse soring to constitute "unlawful acts" and authorizes USDA to promulgate "rules and regulations" as "necessary to carry out the provisions of this chapter."  *Id.*; 15 U.S.C. § 1828.

3.     Following the 1976 amendments to the HPA, USDA, through APHIS, promulgated regulations governing inspections to detect the use of devices, equipment and chemical substances that cause soring and those that attempt to mask it, and enforcement in the event of such detection (the "HPA Regulations," as amended, codified at 9 C.F.R. § 11.1 *et seq.*).  The HPA Regulations have long been acknowledged as failing to end horse soring due to (a) their fundamental flaw— *viz,* allowing the horse industry to regulate itself through Horse Industry Organizations ("HIOs") that hire and license private individuals known as Designated Qualified Persons ("DQPs") to perform inspections and that assess and enforce penalties (and administer appeals of those penalties) of any horse soring identified by DQPs—as well as (b) their failure to prohibit certain devices, equipment and foreign substances that have no legitimate purpose other than to cause horse soring.   Indeed, USDA's Office of Inspector General ("OIG")—after a multi-year investigation—issued a report documenting this fundamental flaw and the overall failure of the HPA Regulations:  The HIO-administered scheme with licensed DQP inspectors embodies a "clear" and "inherent conflict of interest . . . . because DQPs are not independent of the horse show organizers who employ them."   U.S. DEP'T. OF AGRIC., AUDIT REP. 33601-2-KC, ANIMAL AND

PLANT HEALTH INSPECTION SERVICE ADMINISTRATION OF THE HORSE PROTECTION PROGRAM AND THE SLAUGHTER HORSE TRANSPORT PROGRAM 2, 10 (2010), https://www.usda.gov/oig/webdocs/33601-02-KC.pdf. "Because these DQPs are primarily hired from show industry participants . . . they are reluctant to issue violations since excluding horses from the show inconveniences their employers, and makes it less likely they will be hired for other shows. They are also subject to a conflict of interest because, while they are acting as a DQP at one show, they may be an exhibitor at another show, and the exhibitor of the horse they are examining might later act as the DQP. Due to this ineffective inspection system, the Horse Protection Act is not being sufficiently enforced and the practice of abusing show horses continues." *Id*. "We are recommending that APHIS abolish the DQP program, and instead provide independent, accredited veterinarians to perform inspections at sanctioned shows" because the HPA Regulations simply are "not working to accomplish [its] . . . goals." *Id*.

4.      In 2016, APHIS published a proposed rule that—consistent with OIG's findings and USDA's obligation to issue regulations "necessary to carry out" the HPA's statutory mandate to end horse soring—would replace the HIO-administered scheme with USDA-licensed inspectors and would prohibit certain devices, equipment and foreign substances with no legitimate purpose other than to cause horse soring. After holding public meetings online and in Tennessee, Kentucky, California and Maryland and considering the over 130,000 comments submitted on the proposed rule, APHIS duly issued, prescribed or promulgated the Final Rule on January 13, 2017, in accordance with the APA and the FRA.

5.      APHIS duly issued, prescribed or promulgated the Final Rule by signing the Final Rule; by placing the text of the rule on its website in full decisional form with an effective date; by describing the Final Rule in a detailed agency press release, which was widely read by and

distributed among the regulated public; by transmitting the Final Rule to OFR for publication; and by allowing the Final Rule to be placed by OFR on public inspection and scheduled for publication.

6.     After it was placed on public inspection on Thursday, January 19, 2017 and scheduled for publication on Tuesday, January 24, 2017, the Final Rule was not published on January 24.

7.     On or around February 2, 2017, USDA posted an announcement stating that the Final Rule (which USDA characterized as a "final rule") had been withdrawn from Federal Register publication "in accordance with a memorandum issued to Federal agencies on January 20 [hereinafter the "Regulatory Review Memo"] to ensure the new policy team has an opportunity to review it" (the "Withdrawal Announcement").

8.     A non-publicly released document indicates that prior to the Withdrawal Announcement, on January 23, 2017, USDA had requested OFR not to publish the Final Rule.  By that point, however, the Final Rule had been duly issued, prescribed or promulgated, and therefore, such request was tantamount to a repeal of the Final Rule.

9.     OFR complied with USDA's January 23, 2017 request not to publish the Final Rule, even though the Final Rule already had been on public inspection and no postponement of publication was necessary for "error correction."  By doing so, OFR exceeded its authority under the FRA.  Additionally, OFR failed to follow its own regulations when it scheduled the Final Rule for publication on January 24, 2017, instead of the earlier date of January 23, 2017 that would apply under its regulations, thereby allowing USDA additional time to request that OFR not publish the Final Rule.  *See* 1 C.F.R. § 17.2(c).

10.     The Withdrawal Announcement remains on USDA's website today, but it is neither accurate nor genuine:  USDA placed the Final Rule on "inactive" status and subsequently admitted

by its words and actions that it has never engaged in any substantive "review" of it as directed under the Regulatory Review Memo, but instead intends to retain the HPA Regulations that the Final Rule would have replaced and that have failed to achieve the HPA's statutory mandate to end horse soring.

11.     Plaintiffs now seek declaratory and injunctive relief, as well as costs and attorney fees, including an order vacating the repeal of the Final Rule, and any other relief that may be just or proper.

## **PARTIES**

12.     Plaintiff The Humane Society of the United States ("HSUS") is the nation's largest animal protection group.  On behalf of its members, HSUS engages in legislative advocacy, public education, litigation, investigations and rescues to combat animal abuse and exploitation as well as to promote the protection and welfare of all animals, including but not limited to horses.  HSUS is a non-profit organization headquartered in Washington, D.C., and the organization and its affiliates operate regional offices and direct animal care facilities throughout the United States and international offices around the world.

13.     HSUS supports breed and industry organizations that promote the natural gait and humane treatment of Tennessee Walking Horses and racking horses.  HSUS offers rewards to bring horse abusers to justice, works with law enforcement agencies on education about animal cruelty, including horse soring, and assists in law enforcement investigations as well as undertakes its own undercover investigations to identify horse soring and other cruelty to animals.  For example, in 2012, an HSUS undercover investigation led to the arrest, indictment on 52 counts (including felonies), and ultimate guilty plea of a notorious trainer who was known to rely on soring.

14.     Defendants' repeal of the Final Rule has allowed soring to persist unabated as a result of a conflict-ridden inspection program and continued utilization of certain devices, equipment and foreign substances that have no purpose other than to cause horse soring.  As a result, HSUS has been forced to redirect its limited time and resources away from existing horse protection work to identify, investigate, publicize and counteract continuing soring activities that would have been prevented, or at least dramatically reduced, under the Final Rule, and that would no longer be necessary if the Final Rule were reinstated.

15.     HSUS also brings this action on behalf of its members.  The interests HSUS seeks to protect are germane to its organizational purpose, and neither the claim nor the relief requested requires the participation of individual members—even though, as discussed below, at least some HSUS members would otherwise have standing to sue in their own right (*i.e.,* its members have suffered or will suffer concrete and imminent injury).

16.     HSUS's membership includes individuals who are concerned about the welfare of horses in the walking horse industry.  Defendants' repeal of the Final Rule harms HSUS's members by, *inter alia*, preventing them from purchasing tickets to and attending walking horse shows and exhibitions reasonably free from soring; putting exhibitors of "sound" or "not sored" walking horses at a competitive disadvantage against sore horses that are still allowed to compete; and inflicting the aesthetic and emotional injury of either attending shows with the knowledge that the walking horses being shown continue to suffer from soring practices widely recognized as cruel, or refraining from attending those shows in order to avoid that aesthetic injury.  Defendants allow soring to persist through regulations that rely upon an admittedly ineffective self-policing regime, and that permit soring techniques, devices and substances that are prohibited under the Final Rule

to remain in widespread use.  These injuries would be remedied if this Court were to grant the relief requested.

17.     Plaintiff The Humane Society Legislative Fund ("HSLF") joins HSUS in this action on behalf of itself and its members.  HSLF is an animal protection organization incorporated under Section 501(c)(4) of the Internal Revenue Code and operates as a separate affiliate of HSUS. HSLF was formed in 2004 and is based in Washington, D.C.  HSLF works to ensure that animals have a voice before federal and state lawmakers by advocating for measures to eliminate animal cruelty and suffering, and educating the public on animal protection issues.  HSLF has led numerous campaigns related to the HPA, including advocating for increased federal funding to enforce the Act, educating members of Congress on the limitations of the HIO-administered system, and educating the public on the signs and effects of soring.  As a result of Defendants' repeal of the Final Rule, HSLF too has had to divert limited resources away from other anti-cruelty advocacy efforts to continue educating lawmakers and the public on the effects of soring, and its members, many of whom it shares with HSUS, have similarly felt the effects of the repeal both as spectators of and exhibitors in walking horse shows and exhibitions.

18.     Plaintiff Pauline Stotsenberg, a resident of Riverside County, California, is an HSUS member and a horse owner since 1987.  During that time she has owned over 50 horses. Although Mrs. Stotsenberg previously showed, and also owned and managed a facility and business that trained, boarded and bred walking horses, she ceased all such business activities by 2015 after she realized it was impossible for unsored, or "sound," horses to compete in the industry without the prohibitions and regulatory oversight that would have been provided under the Final Rule. Mrs. Stotsenberg would resume her previous activities with walking horses if the Final Rule were implemented.  Additionally, Mrs. Stotsenberg's emotional suffering from her knowledge that

horses continue to be sored would be alleviated at least in part if the Final Rule were implemented, and she would then be free to attend walking horse shows and participate in the walking horse industry without the pain of knowing horses were being sored.

19.    Plaintiff Jana Babuszczak, a resident of Montgomery County, Texas, is an HSUS member and has owned several walking horses since 1987.  Although Ms. Babuszczak showed, trained, boarded and bred walking horses, she ceased training, boarding and breeding by 2008 after she realized it was impossible for sound horses to compete in the industry without the regulatory enforcement that would have been provided under the Final Rule.  In addition to being at a competitive disadvantage because she will not sore the horses she shows, Ms. Babuszczak lost at least one training client because she refused to sore horses.  As a veterinary technician, Ms. Babuszczak is significantly impacted by her knowledge of how much pain and damage the soring techniques inflict upon horses, and so refuses to participate in that cruelty.  Ms. Babuszczak would resume her previous activities with walking horses if the Final Rule were implemented. Additionally, Ms. Babuszczak's emotional suffering from her knowledge that horses continue to be sored would be alleviated at least in part if the Final Rule were implemented, and she would then be free to attend walking horse shows and participate in the walking horse industry without the pain of knowing horses were being sored.

20.    Plaintiff William Coon, a resident of Salt Lake County, Utah, is an HSUS member and was first introduced to walking horses in 1964.  He owned several and began showing horses in 1984.  Mr. Coon owned a horse which, without Mr. Coon's knowledge, was sored by a trainer seeking a competitive advantage.  Mr. Coon later learned his horse won a show only after the trainer had sored the horse.  Mr. Coon became aware of the soring when he stopped by the stable unannounced and found his horse in such agony that it could not stand.  Mr. Coon stopped showing

horses in 1994 after he saw the cruel treatment to which walking horses were subjected absent the regulatory prohibitions and oversight that would have been provided under the Final Rule.  He became a horse exhibition judge in 2001 because he wanted to protect other horses from being sored as his was and because most judges at shows he saw (hired under the current regulations) were rewarding trainers who sored, thereby perpetuating those practices.  Additionally, Mr. Coon's emotional suffering from his knowledge that horses continue to be sored would be alleviated at least in part if the Final Rule were implemented, and he would then be free to attend walking horse shows and participate in the walking horse industry without the pain of knowing horses were being sored.

21.    Plaintiff Kristi Quaintance, a resident of Minnehaha County, South Dakota, is an HSUS and HSLF member.  Since 1997, she has owned over 40 horses as well as showed, bred, and sold walking horses.  Mrs. Quaintance stopped showing horses in 2005 after she realized it was impossible for sound horses to compete without the regulatory prohibitions and oversight that would have been provided under the Final Rule.  She also stopped breeding and selling walking horses, and gelded a stallion she had planned to breed, to prevent any more of her young horses (which she refers to as her "babies") from being tortured in the absence of the regulatory prohibitions and oversight that would have existed had the Final Rule not been unlawfully repealed.  Additionally, Mrs. Quaintance's emotional suffering from her knowledge that horses continue to be sored would be alleviated at least in part if the Final Rule were implemented, and she would then be free to attend walking horse shows and participate in the walking horse industry without the pain of knowing horses were being sored.

22.     Defendant USDA is a federal governmental agency within the meaning of 5 U.S.C. § 552(f)(1) and is entrusted with enforcement of the HPA and the promulgation of rules and regulations thereto.

23.     Defendant APHIS is a federal governmental agency within the meaning of 5 U.S.C. § 552(f)(1) and is tasked by USDA with HPA enforcement.  USDA is the parent agency of APHIS.

24.     Defendant OFR is a federal governmental agency within the meaning of 5 U.S.C. § 552(f)(1) and is entrusted with the publication of the Federal Register.

25.     Defendant Sonny Perdue is the Secretary of USDA and has ultimate responsibility for decisions made by USDA and APHIS, as an office within his Department.  Plaintiffs sue Secretary Perdue in his official capacity.

26.     Defendant Kevin Shea is the administrator of APHIS and is charged with the supervision and management of that agency's decisions and actions.  Plaintiffs sue Administrator Shea in his official capacity.

27.     Defendant Oliver Potts, Director of OFR, is the agency's highest-ranking official and is charged with the supervision and management of all decisions and actions of that agency. Plaintiffs sue Director Potts in his official capacity.

## JURISDICTION AND VENUE

28.     This action arises under APA, 5 U.S.C. §§ 551, 553, 701-706,  the FRA, 44 U.S.C. § 1503, and the HPA.  The Court has subject matter jurisdiction pursuant to these provisions and 28 U.S.C. § 1331.

29.     This Court has the authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 702-706.

30.     Venue is proper in this Court under 28 U.S.C. § 1391(e).  This action is brought against an officer and agency of the United States, and Defendants maintain offices in the District

of Columbia. Venue is also proper under 28 U.S.C. §§ 1391(b)-(c) because plaintiff HSUS resides

and has its principal place of business in this judicial district, and a substantial part of the events

or omissions giving rise to this action occurred in this judicial district.

## STATUTORY FRAMEWORKS

### *The Horse Protection Act*

31.     The HPA provides, irrespective of whether or not USDA or APHIS issue "rules

and regulations," that "[t]he following conduct is prohibited":

> (1) The shipping, transporting, moving, delivering, or receiving of any horse which is sore with reason to believe that such horse while it is sore may be shown, exhibited, entered for the purpose of being shown or exhibited, sold, auctioned, or offered for sale, in any horse show, horse exhibition, or horse sale or auction; except that this paragraph does not apply to the shipping, transporting, moving, delivering, or receiving of any horse by a common or contract carrier or an employee thereof in the usual course of the carrier's business or employee's employment unless the carrier or employee has reason to believe that such horse is sore.
>
> (2) The (A) showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore, (B) entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore, (C) selling, auctioning, or offering for sale, in any horse sale or auction, any horse which is sore, and (D) allowing any activity described in clause (A), (B), or (C) respecting a horse which is sore by the owner of such horse.
>
> (3) The failure by the management of any horse show or horse exhibition, which does not appoint and retain a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse which is sore.
>
> (4) The failure by the management of any horse sale or auction, which does not appoint and retain a qualified person in accordance with section 1823(c) of this title, to prohibit the sale, offering for sale, or auction of any horse which is sore.
>
> (5) The failure by the management of any horse show or horse exhibition, which has appointed and retained a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse (A) which is sore, and (B) after having been notified by such person or the Secretary that the horse is sore or after otherwise having knowledge that the horse is sore.
>
> (6) The failure by the management of any horse sale or auction which has appointed and retained a person in accordance with section 1823(c) of this title, to prohibit the sale, offering for sale, or auction of any horse (A) which is sore, and (B) after

having been notified by such person or the Secretary or after otherwise having knowledge that the horse is sore.

(7) The showing or exhibiting at a horse show or horse exhibition; the selling or auctioning at a horse sale or auction; the allowing to be shown, exhibited, or sold at a horse show, horse exhibition, or horse sale or auction; the entering for the purpose of showing or exhibiting in any horse show or horse exhibition; or offering for sale at a horse sale or auction, any horse which is wearing or bearing any equipment, device, paraphernalia, or substance which the Secretary by regulation under section 1828 of this title prohibits to prevent the soring of horses.

(8) The failing to establish, maintain, or submit records, notices, reports, or other information required under section 1823 of this title.

(9) The failure or refusal to permit access to or copying of records, or the failure or refusal to permit entry or inspection, as required by section 1823 of this title.

(10) The removal of any marking required by the Secretary to identify a horse as being detained.

(11) The failure or refusal to provide the Secretary with adequate space or facilities, as the Secretary may by regulation under section 1828 of this title prescribe, in which to conduct inspections or any other activity authorized to be performed by the Secretary under this chapter.

15 U.S.C. § 1824 ("Unlawful Acts").

32.     USDA and APHIS are charged with issuing "rules and regulations" "necessary" to carry out the HPA's prohibition on "Unlawful Acts:"  "The Secretary is authorized to issue such rules and regulations as he deems necessary to carry out the provisions of this chapter."  15 U.S.C. § 1828 ("Rules and Regulations").

33.     The HPA framework indicates that the APA governs the Secretary's promulgation of rules and regulations pursuant to Section 1828.

### The Administrative Procedure Act

34.     The APA defines "agency action" to include *inter alia* "the whole or part of an agency rule," 5 U.S.C. § 551(13), and defines "rule," in turn, as the "whole or a part of an agency

statement of general or particular applicability and future effect designed to implement . . . law or policy . . . ." *Id.* § 551(4).

35.     "Rule making" is the "process [of] formulating, amending, or repealing a rule." *Id.* § 551(5).   APA Section 553 mandates procedural requirements for rulemaking and typically requires that a "[g]eneral notice of proposed rule making shall be published in the Federal Register," but establishes an exception from Federal Register publication when "persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with the law." *Id.* § 553(b).   "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." *Id.* § 553(c).

36.     "After consideration" of the written data, views or arguments presented by interested persons, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.*   "[P]ublication or service of" this final rule must occur "not less than 30 days before its effective date." *Id.* § 553(d).

37.     The APA provides for judicial review of any "final agency action for which there is no other adequate remedy in a court"—including the promulgation and repeal of a final rule.   "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."   *See id.* §§ 702, 704.

38.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).   An agency action is arbitrary and capricious if the agency's analysis is internally inconsistent or inadequately explained, or if it diverges from prior

policies and standards without providing a reasoned explanation for why the agency changed course.

### The Federal Register Act

39.     The Federal Register Act ("FRA") directs that "[t]here shall be published in the Federal Register . . . documents or classes of documents that may be required so to be published by Act of Congress."  44 U.S.C. § 1505(a)(3).

40.     OFR is responsible for the prompt and uniform printing and distribution of documents required to be published in the Federal Register.  *See* 44 U.S.C. § 1502.  The FRA requires that documents to be published in the Federal Register be transmitted to OFR for processing prior to publication.  *See id.* § 1503.  Upon receipt, OFR must make each document "immediately available for public inspection," and must transmit each document "immediately to the Government Publishing Office for printing" in the Federal Register.  *Id.*

41.     OFR's regulations to implement the FRA allow for withdrawal of documents prior to publication only where necessary to correct extensive errors in the document.  1 C.F.R. § 18.13(a) ("Withdrawal or correction of filed documents") provides: "A document that has been filed for public inspection with the Office of the Federal Register but not yet published, may be withdrawn from publication or corrected by the submitting agency. Withdrawals or minor corrections may be made with a timely letter, signed by a duly authorized representative of the agency.  Extensive corrections may require agency withdrawal of the document from publication."

42.     OFR's *Document Drafting Handbook* contains only one reference to § 18.13, which appears in Chapter 5: "How Do I Correct A Document?"  That chapter discusses withdrawing a document from publication where necessary to make more extensive corrections.  *See* NAT'L ARCHIVES AND RECS. ADMIN., OFFICE OF THE FED. REG., *DOCUMENT DRAFTING HANDBOOK* § 5-2 (2019), https://www.archives.gov/files/federal-register/write/handbook/ddh.pdf.

43.     OFR regulations to implement the FRA require public inspection and publication based on a prescribed schedule.  1 C.F.R. § 17.2 ("Procedure and timing regular schedule") states: "(b) . . . each document received by 2:00 p.m. which meets the requirements of this chapter shall be assigned to the regular schedule. . . . (c)  The regular schedule for filing for public inspection and publication is as follows:

| Received before 2 PM | Filed for Public Inspection | Published |
|---|---|---|
| Monday | Wednesday | Thursday |
| Tuesday | Thursday | Friday |
| Wednesday | Friday | Monday |
| Thursday | Monday | Tuesday |
| Friday | Tuesday | Wednesday |

"Where a legal Federal holiday intervenes, one additional work day is added."

44.     Under the FRA, "[a] document required . . . to be published in the Federal Register is not valid as against a person who has not had actual knowledge of it until . . . the document ha[s] been filed with the Office of the Federal Register and a copy made available for public inspection . . . ."  44 U.S.C. § 1507.  Unless otherwise provided by statute, "filing of a document . . . is sufficient to give notice of the contents of the document to a person subject to or affected by it."  *Id.*  Moreover, "[t]he publication in the Federal Register of a document creates a rebuttable presumption – (1) that it was duly issued, prescribed, or promulgated."  *Id.*

### *The Freedom of Information Act*

45.     The Freedom of Information Act ("FOIA") provides that "[e]ach agency shall separately state and currently publish in the Federal Register for the guidance of the public . . . (D) substantive rules of general applicability adopted as authorized by law. . . ."  5 U.S.C. § 552(a)(1)(D).

17

46.     FOIA sets forth the following exception:  "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."  *Id*. § 552(a).

## FACTUAL BACKGROUND

### *The Walking Horse Industry And The Cruel And Inhumane Practice Of Horse Soring*

47.     The Tennessee Walking Horse was originally bred to provide a more comfortable ride to Southern plantation owners who spent hours on horseback.  As these farmers gradually turned to motor vehicles, breed owners sought to preserve the walking horse by forming a national registry association and by organizing horse shows.  Racking horses perform a similar but different four-beat gait, and were later established as a separate but related offshoot breed from the Tennessee Walking Horse with their own registry.

48.     In the earliest shows, walking horses were honored to the extent they exemplified the steady, relaxed gait said to be natural to the breed.  But by the late 1940s, some trainers began experimenting with new techniques emphasizing increased motion and speed, with the additional objective of lifting the horse's head and front limbs further from the ground.  The goal was a unique running-walk with a dramatic, high-prancing action of the front limbs.

49.     In the 1950s, trainers learned that this gait could be greatly exaggerated by "soring" the front feet of the horse.  If the front feet were sore, the horse would lift them quickly from the ground and shift its weight to the hind legs.  While horses naturally place as much as 65 percent of their body weight on the front limbs, the so-called "Big Lick" gait could be achieved only by reversing these proportions.  Soring is the use of any method, substance, or device that inflicts pain on a horse in order to induce a desired gait.  Several methods are commonly used to sore horses, including chemical irritants, applied to the horse's pasterns, painful objects placed under the

18

hooves and rolling or sliding "action" devices which cause or exacerbate pastern soreness with movement. Methods may be concealed from judges and inspectors through the use of additional chemicals, hoof pads and bands. To evade detection, trainers often subject sored horses to "stewarding," in which trainers kick, shock or beat the horse, or affix metal clips to its mouth and gums, among other methods, to condition the animal not to react to pain during an inspection. Big Lick walking horse and racking horse competitions are mostly found in America's Southeast, including Tennessee, Kentucky, Alabama, Mississippi, Georgia, North Carolina and South Carolina, and to a lesser extent, Florida, Texas, Missouri, Virginia and Louisiana. The largest of these shows, the Tennessee Walking Horse National Celebration in Shelbyville, Tennessee, has been held annually since 1939.

50.     A June 1956 article in Sports Illustrated magazine entitled "Woe for Walkers" was among the first to highlight the "torture" and "disgraceful cruelty" of horse soring, which in some cases was so painful that horses were "too sore to get up." Alice Higgins, *Woe for Walkers*, SPORTS ILLUSTRATED, Jul. 22, 1956, https://www.si.com/vault/1956/07/23/582329/woe-for-walkers. In the years after this article, animal welfare groups and other news articles raised the alarm about horse soring. Despite attempts by some to curb soring, however, the practice continued unabated. In 1965, U.S. Senator Joseph Tydings began advocating for the passage of a federal law to end horse soring. USDA initially opposed the legislation, and the bill died in committee. But in 1967, public support intensified, and USDA dropped its opposition.

### *The Horse Protection Act Imposes A Statutory Mandate To End Horse Soring*

51.     Congress passed the Horse Protection Act of 1970, followed by the Horse Protection Act Amendments of 1976 (together, the "HPA," codified at 15 U.S.C. § 1821 *et seq.*), to end horse soring. The HPA prohibits exhibiting or selling sore horses, or transporting sore horses with reason to believe that the horse may be sold, shown or exhibited. 15 U.S.C. § 1824(1)-

(2).  The HPA also requires the management of horse shows and exhibitions to disqualify any horse that is sore.  *Id.* § 1823(a).  Criminal penalties apply to knowing violations of the HPA.  *Id.* § 1825(a).

52.     The HPA defines the term "sore" to include any horse which suffers physical pain or distress when walking as result of (a) the application of an irritating or blistering agent, (b) the infliction of a burn, cut or laceration, (c) the injection of a tack, nail, screw or chemical agent, or (d) any other substance or device used on the limb of the horse.  *Id.* § 1821(3).

53.     In adopting the HPA, Congress declared that the practice of soring horses for the purposes of affecting their natural gait is "cruel and inhumane."  *Id.* § 1822(1).  Congress further found that horses which are sored "compete unfairly" with horses which are not sored.  15 U.S.C. § 1822(2).  Moreover, according to the Senate Report from the Senate Commerce Committee regarding the legislation, "persons who refuse to sore their horses have been faced with a difficult dilemma:  either they must forgo most opportunities to compete successfully in horse shows, or they must devote their attentions to a different breed of horse."  S. Rep. No. 91-1591, at 2 (1970).

54.     The Horse Protection Act of 1970, however, failed to prevent the showing of sore horses or to eliminate the incentives that lead owners and trainers to sore their horses.  S. Rep. No. 93-1282, at 2 (1974).  In fact, a Senate committee found "overwhelming evidence that soring continued to be widely practiced after the passage of the Horse Protection Act."  *Id.*

55.     Alarmed by the continued and pervasive practice of horse soring, Congress passed the Horse Protection Act Amendments of 1976.  The Amendments directed USDA to "prescribe by regulation" that "management of any horse show, horse exhibition, or horse sale or auction" appoint qualified inspectors to assess whether horses are sore.  *See* 15 U.S.C. § 1823(c).  As a House committee explained, USDA would be authorized to "prescribe [the inspectors']

qualifications and duties," adopt any "accreditation requirements," and "prescribe the conditions to assure [the inspectors'] independence of judgment."  H. Rep. 94-1174, at 8 (1976).

56.     The amended law required horse show and exhibition management to disqualify any horse identified as sore by an inspector.  15 U.S.C. § 1823(a).  If the horse show and exhibition management did not appoint an inspector to detect soring, management nevertheless would be required to disqualify sore horses.  *Id.* § 1824(3).  Congress also increased funding for carrying out the HPA five-fold to $500,000.  *Id.* § 1831.

### *The HPA Regulatory History And The HPA Regulations That The Final Rule Would Have Replaced Until Its Unlawful Repeal*

57.     USDA delegated its authority under the HPA to APHIS, and in 1972, APHIS promulgated the first regulations pursuant to the Horse Protection Act of 1970.  Horse Protection Regulation, 37 Fed. Reg. 2,426 (Feb. 1, 1972).  The first HPA regulations prohibited certain "action devices" (defined as boots, collars, chain, beads, bangles, rollers, or other devices which operate by rotating around or moving up and down the leg of the horse, causing friction or striking the hoof, coronet band, or fetlock joint).  The regulations also required that show management either disqualify sored horses themselves or appoint a USDA-accredited veterinarian to inspect horses and report violations to show management, which in turn must disqualify sored horses and report violations to APHIS.  *Id.*  The new regulations were immediately met with open hostility and even aggression at local shows.  In 1972, for example, the USDA had to send three U.S. Marshals to protect its inspectors after 35 of the 107 entrants were disqualified at the National Celebration.  The disqualifications prompted angry trainers to storm into the show ring, forcing the cancellation of the day's remaining events.

58.     APHIS revised its regulations in 1975 to address complaints from the horse industry that the then-existing regulations were unnecessarily restrictive.  40 Fed. Reg. 36,553 (Aug. 21,

1975). Only one year later, however, Congress amended the HPA to strengthen its statutory mandate to end horse soring, and APHIS was required to promulgate new regulations. In particular, following passage of the Horse Protection Act Amendments of 1976, APHIS revised the horse soring regulations. *See* Definition of Terms and Certification and Licensing of Designated Qualified Persons, 44 Fed. Reg. 1558 (Jan. 5, 1979); Prohibition Concerning Exhibitors of Horses, Transportation, Inspection and Detention of Certain Horses, Responsibilities, Liabilities, 44 Fed. Reg. 25,172 (Apr. 27, 1979). These regulations, last amended in the 1990s (hereinafter the "HPA Regulations"), would have been replaced by the Final Rule until its unlawful repeal.

59.    The HPA Regulations established an inspection and enforcement scheme administered by HIOs, which the Regulations define essentially as individuals with commercial involvement in the industry, *viz*, HIO "means an organized group of people, having a formal structure, who are engaged in the promotion of horses through the showing, exhibiting, sale, auction, registry, or any activity which contributed to the advancement of the horse." 9 C.F.R. § 11.1.

60.    HIOs are "certified" by APHIS to administer a DQPs training and licensing program. *Id.* § 11.7. Any licensed DQP can then be hired by management of a horse show "to detect or diagnose horses which are sore or to otherwise inspect horses and any records pertaining to such horses for the purposes of enforcing the Act." *Id.* at § 11.1*; see also id.* at § 11.7(a).

61.    The HPA Regulations establish general inspection requirements for DQPs. *Id.* § 11.21. These requirements aim through such inspection for the DQP to detect "violations" of the HPA Regulations based on two "prohibitions" set forth in the Regulations:   (a) "General prohibitions" of any device, equipment or substance "if such use causes or can reasonably be

expected to cause such horse to be sore," *id.* § 11.2(a), and (b) "Specific prohibitions" of particular devices and equipment enumerated in the Regulations, *id.* § 11.2(b), including "action devices" that weigh more than 6 ounces.  *Id.* at § 11.2(b)(7).  (An "action device" is "any boot, collar, chain, roller, or other device which encircles or is placed upon the lower extremity of the leg of a horse in such a manner that it can either rotate around the leg, or slide up and down the leg so as to cause friction, or which can strike the hoof, coronet band or fetlock joint."  *Id.* § 11.1.)  In addition, "substances are prohibited on the extremities above the hoof . . . while [the horse is] being shown, exhibited or offered for sale" except for "lubricants" furnished or controlled by management.  *Id.* § 11.2(c).

62.     As a matter of practice, only the specific prohibitions are enforced.  *See* 81 Fed Reg. 49112, 49117-49118 (July 26, 2016); Final Rule at 30-33.  In its 1979 rulemaking document explaining the specific prohibitions on action devices that weigh more than six ounces, APHIS recognized that prohibiting all devices except for protective boots would make enforcement of the HPA easier, but concluded that "such drastic action is unwarranted at this time."  Prohibition Concerning Exhibitors of Horses, Transportation, Inspection and Detention of Certain Horses, Responsibilities, Liabilities, 44 Fed. Reg. at 25,173.  "However, if the horse industry makes no effort to establish a workable self-regulatory program for the elimination of sore horses, or if such a program is established but does not succeed in eliminating the sore horse problem within a reasonable length of time, the Department will give serious consideration to the prohibition of all action devices and pads."  *Id.*

63.     Horse show management may appoint and retain DQPs from any HIO with a certified DQP program.  If a DQP finds a "violation," the DQP "shall immediately report [it] to the management of any horse show, horse exhibition or horse sale or auction".  If such report is

received by management before that horse has been shown, exhibited, sold or auctioned, then management "shall immediately disqualify or disallow" that horse.  9 C.F.R. § 11.20(b)(1). Whether or not such disqualification or disallowance has occurred, "[t]he HIO that licensed the DQP" also must "assess and enforce penalties for violations" and allow for appeals based on that HIO's "rulebook." *Id.* §§ 11.21(d), 11.25(a).  While HIOs must annually submit their association rulebooks to USDA as part of certification, HIOs have broad discretion to set internal penalty schemes and appeal procedures.

### USDA Recognizes That The HPA Regulations Have Failed To Achieve The HPA's Statutory Mandate To End Horse Soring

64.     On September 30, 2010, OIG published the results of a two-year investigation of horse soring in horse shows that focused on the inadequacies of the HIO-administered scheme for enforcing the HPA through licensed DQP inspectors.  *See* U.S. DEP'T. OF AGRIC., *supra* section 3.

65.     According to the Audit Report, "OIG and APHIS have together reached the conclusion that the system of inspections based on DQPs is not working to accomplish the goals of the law. . . ."  *Id.* at 10.   The Audit Report concluded that the inadequacy of the HIO-administered scheme with licensed DQP inspectors stems from "inherent" and "direct" conflict of interest.  *Id.* at 10-11.  First, because DQPs are "primarily hired from show industry participants . . . they are reluctant to issue violations[,] since excluding horses from the show inconveniences their employers, and makes it less likely they will be hired for other shows."  *Id.*  Second, "while they are acting as a DQP at one show, they may be an exhibitor at another show, and the exhibitor of the horse they are examining might later act as the DQP."  *Id.*  Under the system, "the horse show management gets the best of both worlds"—limited liability with regard to the HPA and an ineffective inspection and enforcement scheme that rarely detects soring or disqualifies sored horses from shows.  *Id.*

66.     As part of its investigation, between August 2008 and August 2009, OIG sent auditors to horse shows in Tennessee, Missouri, South Carolina, Florida and Kentucky.  *Id.* at 35. Auditors interviewed APHIS personnel, reviewed horse show reports, monitored actual inspections and generally observed horse shows.  *Id.*  Examples of deficient inspections observed during these visits included:  (a) a DQP who admitted he gave each exhibitor three "freebies" before issuing a ticket; (b) a DQP who, in violation of applicable regulations, "kept his back turned" to horses while they walked, and then failed to inspect horses that placed first; and (c) a DQP who changed the name on a ticket after placing a phone call to the stable.  *Id.* at 12-13. APHIS veterinarians also explained to Auditors during interviews that exhibitors frequently send their children, friends and employees to accept tickets so that the actual exhibitors could avoid penalties entirely.  *Id.*

67.     In addition, auditors reviewed data from over 1,000 horse shows that occurred between 2005 and 2008, and found that "DQPs are much more likely to find evidence of soring when APHIS employees are present than when they are not."  *Id.* at 11.  Specifically, 49 percent of all tickets issued by DQPs were issued at the six percent of shows where APHIS employees were present.  *Id.*

68.     OIG concluded:  "[g]iven the problems we observed with DQPs and the conflicts of interest, we are recommending that APHIS abolish the DQP program, and instead provide independent, accredited veterinarians to perform inspections at sanctioned shows."  *Id.* at 3.  If APHIS "replac[ed] the DQP Program with a system of independent veterinarians," then "[e]xhibitors would have greater confidence that other exhibitors were competing fairly," and "horse show organizers would be more confident that they were in full compliance with the law." *Id.* at 17.

69.     APHIS agreed with the "intent" of the Audit Report's recommendations, and proposed to "abolish the current DQP licensing system," turning over licensing to APHIS officials. APHIS also agreed to establish "strict qualification and criteria to prohibit conflicts of interest." *Id.* at 18.  In 2012, APHIS concluded:  "[O]ver 30 years of industry self-regulation through the DQP program has failed to eliminate the cruel and inhumane practice of soring."  Horse Protection Act; Requiring Horse Industry Organizations to Assess and Enforce Minimum Penalties for Violations, 77 Fed. Reg. 33,607, 33,609 (June 7, 2012).

### *Independent Organizations Concluded That The Failure Of The HPA Regulations To Prohibit Certain Devices And Equipment Have Allowed Horse Soring To Continue In Violation Of The HPA's Statutory Mandate To End It*

70.     Two years after OIG published the Audit Report, the American Veterinary Medical Association ("AVMA") and the American Association of Equine Practitioners ("AAEP") urged APHIS to ban all action devices and pads, including those weighing less than six ounces.  Am. Veterinary Med' Ass'n and Am. Ass'n of Equine Practitioners, AVMA and AAEP Position on the Use of Action Devices and Performance Packages for Tennessee Walking Horses (June 14, 2012), https://aaep.org/avmaaaep-position-use-action-devices-and-performance-packages-tennessee-walking-horses.  According to the AVMA and AAEP, because horse soring has continued since the passage of the HPA and the industry has failed to make substantial progress in eliminating the practice, a ban is "necessary."  *Id.*

71.     The AVMA and AAEP explained that, when action devices are used "in conjunction with chemical irritants on the pastern of the horse's foot, the motion of the action device creates a painful response, resulting a more exaggerated gait."  *Id.*  Pads also may be used to "add weight to the horse's foot, causing it to strike with more force and at an abnormal angle to the ground" and to "facilitate the concealment of items that apply pressure to the sole of the horse's

hoof." *Id.*  According to the AVMA and AAEP, "[p]ressure from these hidden items produces

pain in the hoof so that the horse lifts its feet faster and higher in an exaggerated gait." *Id.*

### USDA Amends HPA Regulations To Strengthen HIO-Administered Scheme, But Its Action Is Vacated By Court of Appeals

72.    In response to reports of continued soring and abuse, from 2010 to 2012, HSUS

submitted a series of petitions for rulemaking to strengthen the HIO-administered scheme and

"ensure uniform and effective enforcement of the [HPA]."  Humane Soc'y of the U.S. et al.,

Petition for Rulemaking, U.S. Dep't of Agric., No. APHIS-2011-0006, APHIS Doc. No. APHIS-

2011-0006-0002 at 3 (Aug. 4, 2010), https://www.regulations .gov/document?D=APHIS-2011-

0006-0002.

73.    On August 4, 2010, HSUS submitted a petition for rulemaking requesting that

APHIS amend the HPA Regulations to, among other things, require that HIOs adopt a minimum

penalty structure for HPA violations, permanently disqualify scarred horses and certain repeat

individual offenders of the HPA from participating in all horse showing activities and decertify

HIOs that fail or otherwise refuse to correct instances of noncompliance under the Act.  *Id.*  The

minimum penalty regime, in particular, was designed to remedy certain "inconsistent and optional

penalty structures permitted by USDA" that the evidence indicated "facilitate nonenforcement and

repeated soring," in part, by allowing show management to selectively contract with HIOs that

tended to impose softer penalties.  *Id.* at 23.

74.    On March 21, 2012, HSUS amended its petition to also request that APHIS consider

the use of masking agents (i.e., certain foreign substances applied to a horse's body to mask

evidence of soring) a felony offense under Section 1825(a)(2)(C) of the Act.  *See* Letter from

Jonathan R. Lovvom, Senior Vice President, Humane Soc'y of the U.S., to  Tom Vilsack, Sec'y,

U.S. Dep't of Agric. at 1 (March 21, 2012).  HSUS noted that that new evidence suggested that

the abuse of Tennessee Walking Horses remained "rampant" and that "additional enforcement of the HPA is desperately needed." *Id.* at 2.

75.     After HSUS submitted the petitions, APHIS amended the HPA Regulations in 2012 to require HIOs to assess and enforce certain minimum penalties.  Horse Protection Act; Requiring Horse Industry Organizations To Assess and Enforce Minimum Penalties for Violations, 77 Fed. Reg. 33,607 (June 7, 2012).  APHIS denied HSUS's other requests under the petitions.

76.     However, in 2015, the Fifth Circuit concluded that APHIS's final rule extended beyond the statutory authority under the HPA, and further that only USDA itself—not the HIOs— has enforcement authority under the HPA.  *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 273-74 (5th Cir. 2015).

77.     On February 18, 2015, HSUS submitted a new petition for rulemaking under the HPA.  Consistent with the findings of the Fifth Circuit, the recommendations of the Audit Report and the findings of the AVMA and AAEP, the new petition requested that APHIS amend the HPA Regulations to eliminate the HIO-administered system and transfer all enforcement authority to a system administered by APHIS.  Humane Soc'y of the U.S., Supplemental Petition for Rulemaking to Amend Regulations Under the Horse Protection Act, U.S. Dep't of Agric. at 4 (Feb. 18, 2015). The petition also requested that the HPA Regulations ban the use of action devices, pads, wedges and hoof bands.  *Id.*  HSUS was particularly concerned that, with the minimum penalty system invalidated and USDA Veterinary Medical Officers ("VMOs") attending only a fraction of shows and exhibitions, USDA's enforcement capabilities would be materially diminished under the existing HIO-administered scheme.

### *USDA Engages In Rulemaking To Eliminate HIO-Administered Scheme*
### *And To Prohibit Certain Devices And Equipment*

78.     On July 26, 2016, APHIS published a proposed rule in the Federal Register entitled "Horse Protection: Licensing of Designated Qualified Persons and Other Amendments" (the "Proposed Rule").  81 Fed. Reg. 49,112.  The Proposed Rule would eliminate the HIO-administered scheme with licensed DQP inspectors—replacing it with an APHIS-run program that would train, license, and monitor third-party inspectors—and would otherwise eliminate all regulatory responsibilities of HIOs.  *Id.*  APHIS also proposed to ban all action devices, pads, wedges and hoof bands.  81 Fed. Reg. at 49,117.  Because all action devices would be banned, there would be no need for "lubricants" or other substances associated with horse soring; thus, the Proposed Rule would eliminate all substances.

79.     APHIS explained its rationale as follows:

- "The [OIG Report's] findings and our own experience with the DQP program indicate that the current program facilitates conflicts of interest between HIOs and DQPs that contribute to the persistence of soring in the gaited horse industry."  *Id.* at 49,119.

- The Agency "agrees with the OIG's conclusion that the current program of HIOs training and licensing DQPs is not adequately detecting soring or promoting enforcement of the Act," *id.* at 49,113, and that the proposed changes are "necessary," *id.* at 49,115.

- "We have observed . . . from our direct experience in enforcing the Act and regulations over many years that [action devices], when used in combination with prohibited foreign substances . . . can create lesions and inflammation that constitute soring. . . . [W]e have diagnosed soring in horses that have worn

chains under 6 ounces and other devices allowed in the current regulations. . . ." *Id.* at 49,120.

- "Our experience at horse shows and exhibitions also indicates that soring has continued to occur through the use of hoof pads . . . . Pads used in performance packages can conceal objects that produce pain or be designed to cause the horse's hoof to strike the ground at an abnormal angle . . . resulting in an exaggerated gait." *Id.* at 49,120.

80. Following publication of the Proposed Rule, APHIS accepted comments and hosted public meetings online and in person in Tennessee, Kentucky, California and Maryland. In total, APHIS received and reviewed over 130,000 comments on the Proposed Rule.

81. On October 24, 2016, 181 members of Congress, including two doctors of veterinary medicine, submitted a letter to USDA, urging it to "act expeditiously to finalize [the rule] before the end of this Administration," and to ensure that the final rule "[e]liminate[s] the industry self-policing system . . . and replace[s] it with USDA-licensed and trained third-party, independent inspectors who will be . . . accountable to [APHIS]." *See* Members of Cong., 114th Cong., Letter on Horse Protection; Licensing of Designated Qualified Persons and Other Amendments [Docket No. APIDS-2011-0009] 1 (Oct. 24, 2016), https://yoho.house.gov/sites/ yoho.house.gov/files/USDA%20HPA%20Member%20Letter_Signed_October%2024%2C%202 016.pdf. The letter further encouraged USDA to "end" the use of action devices, pads, wedges, hoof bands and other devices not used specifically for therapeutic purposes. *Id.* at 2.

### *USDA Duly Promulgates Final Rule*

82. On January 13, 2017, at 4:39 PM EST, USDA issued a press release to its website under the title, "USDA Announces Changes Aimed at Ending the Inhumane Practice of Horse Soring" (the "Final Rule Press Release," attached as Exhibit C). The Final Rule Press Release

stated:  "The U.S. Department of Agriculture's (USDA) Animal and Plant Health Inspection Service (APHIS) today announced a final rule that includes changes that will help to protect horses . . . ."   Exhibit C at 1.

83.     The Final Rule Press Release included a hyperlink to a 149-page PDF document labeled "Action: Final rule" and entitled, "Horse Protection; Licensing of Designated Qualified Persons and Other Amendments" (the "Final Rule," attached as Exhibit A).  The Final Rule was dated January 11, 2017 and signed by David Howard in his official capacity as USDA Acting Deputy Under Secretary for Marketing and Regulatory Programs.  The Final Rule explained that APHIS's actions were necessary to "strengthen enforcement of the HPA and regulations, and help protect horses from the cruel and inhumane practice of soring and eliminate the unfair competitive advantage that sore horses have over horses, that are not sore."  Exhibit A at 5.

84.     The Final Rule listed an effective date of January 1, 2018 for all sections, "except for §§ 11.02 and 11.14, which are effective [Insert date 30 days after date of publication in the Federal Register]."  *Id.* at 2.  The first of these two sections — § 11.02 — bans action devices, and the second of these two sections — § 11.14 — eliminates HIO responsibility for training inspectors and imposes various requirements for inspectors.  The fact that these two sections were to become effective quickly underscores the recognition by USDA and APHIS of the need for immediate action towards achieving the HPA's statutory mandate to end horse soring, while the remainder of the Final Rule's replacement scheme would require additional phase-in time.

85.     The Final Rule abolishes the HIO-administered scheme with licensed DQP inspectors and replaces it with an APHIS-administered scheme with independent inspectors who are veterinarians or veterinary technicians trained, licensed and monitored by APHIS.  In other words, the Final Rule abolishes the scheme in the HPA Regulations and replaces it with a wholly

new one.  In support of this decision, APHIS provided a detailed and specific legal and policy rationale and cited to various sources of evidence.  Specifically, APHIS:

- Cited the Audit Report's conclusion that the DQP program "is not adequate to effectively enforce the Act and regulations." *Id.* at 3.

- Concluded that evidence from the Audit Report "clearly demonstrates" a conflict of interest and the "ineffectiveness of the resulting system." *Id.* at 66.

- Concluded that the Audit Report's recommendation was consistent with the findings of USDA's Office of the Judicial Officer, which issues final decisions on behalf of the Secretary of Agriculture for purposes of judicial review. *Id. at 4.*  The Secretary, through the Judicial Offer, "has routinely found that inspections of horses conducted by [DQPs] are less probative than inspections conducted by the USDA Veterinary Medical Officers (VMOs).  In making such findings, the Secretary has noted that DQPs often conduct 'short and cursory' inspections given the volume of horses they must inspect prior to HPA-covered events, that DQPs are not veterinarians and do not maintain the same qualifications, and that DQPs must engage with members of the industry on a daily basis, which may make them reluctant to notify management that a horse is sore." *Id.*

- Cited USDA Secretary's conclusion that "DQPs often conduct 'short and cursory' inspections given the volume of horses they must inspect prior to HPA-covered events,. . . . and that DQPs must engage with members of the industry on a daily basis, which may make them reluctant to notify management that a horse is sore." *Id.*

86.     The Final Rule also prohibits the use on Tennessee Walking Horses and racking horses of all action devices, including chains under six ounces, as well as pads and wedges (with exceptions for certain protective and therapeutic devices).  *Id.* at 126.  In support of this decision, which APHIS concluded was "necessary" to prevent soring, the Agency again provided a detailed and specific legal and policy rationale and cited to various sources of evidence.  Specifically, APHIS:

- Cited its "experience from administering and enforcing the Act that chains and similar action devices currently allowed under the regulations are used alone, or in conjunction with certain prohibited substances, to sore horses.  Restricting the use of such devices on horses at any horse show, exhibition, sale, or auction will reduce instances of soring in these horses and will help to promote fair competition at HPA-covered events."  *Id.* at 25-26.

- Cited the Agency's own observations that soring "can and does occur with the use of prohibited substances and/or action devices such as chains and rollers of nearly any weight, including the 6 ounce weight limit currently in the regulations."  *Id.* at 19.

- Discussed "our experience in administering and enforcing the HPA [which] indicates that soring has continued to occur through the use of hoof pads. Approximately 90 percent of the alleged violations documented at HPA-covered events from FY 2010 through 2015 involved horses wearing pads."  *Id.* at 30.  In this context, APHIS also cited a study conducted at the Auburn University School of Veterinary Medicine, which found not only that raising a horse's heels through the use of pads and wedges alone results in signs of

inflammation, but also that pads obscure the solar surface of the foot, thereby limiting inspectors' ability to detect soring through physical and visual inspection. *Id.* at 31.

- Noted that the Agency's observations with regard to chains, rollers and similar action devices are consistent with the positions held by the AVMA and the AAEP. *Id.* at 18.

- Noted that while "[a] considerable number of commenters supported our proposal to prohibit the application of action devices and pads on a horse's limbs for animal welfare reasons, while others supported the prohibition because such items allowed sored horses to gain a competitive advantage." *Id.* at 20.

87.     The Final Rule Press Release, which was posted as a "Stakeholder Announcement" on APHIS's News and Announcement webpage, described the substance of the Final Rule in detail and stated, "Under the final regulation[,] APHIS will license, train, and oversee independent, third party inspectors . . . . Beginning January 1, 2018, management of horse shows . . . must appoint and retain [third party inspectors] to inspect horses."   Exhibit C at 1.

### *Public Reaction to the Final Rule*

88.     In the days after USDA posted the Final Rule and the Final Rule Press Release on its website, news websites and industry blogs disseminated the text of the Rule and described the anticipated effects of the Rule on the industry.

89.     On January 14, 2017, U.S. Sen. Lamar Alexander (R-Tenn.), who opposed the Final Rule, issued a press release lamenting that USDA had "finalized a rule" banning action devices and requiring third-party, USDA-licensed inspectors.   The release states, "On Jan. 13, USDA

published a final rule . . . ,'' and sets forth a purported rationale as to why the Final Rule could have a "significant negative effect" on the industry.  Press Release, Sen. Lamar Alexander, New Obama Rule Jeopardizes Tennessee Walking Horse Tradition (Jan. 14, 2017), https://www.alexander.senate.gov/public/index.cfm/2017/1/alexander-new-obama-rule-jeopardizes-tennessee-walking-horse-tradition.

90.     On January 17, 2017, a widely-known horse industry website, thehorse.com, posted an article titled, "Chains, Stacks Banned in Walking Horse Training, Exhibition."  The article begins:  "A new USDA [] rule has banned the use of chains and stacks in the training and exhibition of Tennessee Walking Horses . . . . The final rule published on Jan. 13 specifically prohibits the use of action devices . . . ." Pat Raia, Chains, Stacks Banned in Walking Horse Training, Exhibition (Jan. 17, 2017), https://thehorse.com/19485/chains-stacks-banned-in-walking-horse-training-exhibition/.

91.     On one "Daily Equine Forum," a user wrote in a January 14, 2017 post, "Big Lick is DEAD!!!"  "Finally, the horrible abuse . . . on innocent horses is over or at least there is a law in place banning the soring . . . ."  The user included a hyperlink to the Final Rule Press Release. *See* "Big Lick is DEAD," Daily Equine Forums (Jan. 14, 2017), https://www.dailyequine.com/showthread.php?tid=9027&tid=9027 (last visited Aug. 6, 2019).

92.     Several industry sites linked directly to the text of the Final Rule, including Americanfarriers.com, Nationalhorseman.com, Morganhorse.com, Paulickreport.com, and Horse-canada.com.

### *USDA Transmits The Final Rule To OFR*

93.     On or around Monday, January 16, 2017, USDA transmitted the Final Rule to OFR. The Final Rule was signed by David Howard, USDA Acting Deputy Under Secretary for Marketing and Regulatory Programs, and was dated January 11, 2017.  OFR posted the Final Rule

for "public inspection" on Thursday, January 19, 2017, and assigned a publication date of Tuesday, January 24, 2017.  The document was hyperlinked in PDF file format on OFR's January 19, 2017 online "Public Inspection Issue," under document number 2017-00854 (the "Posted Final Rule").

### USDA Secretly Repeals The Final Rule

94.     On Friday, January 20, 2017, Inauguration Day, President Trump's Chief of Staff Reince Priebus issued a memorandum directed to agency heads entitled, "Regulatory Freeze Pending Review" (the "Regulatory Review Memo").  The Regulatory Review Memo directed agencies to "immediately withdraw" any regulations that "have been sent to the OFR but not published in the Federal Register" (the "Withdrawal Directive").  *See* Memorandum from The White House to the Heads of Executive Departments and Agencies (Jan. 20, 2017), https://www.whitehouse.gov/presidential-actions/memorandum-heads-executive-departments-agencies/.

95.     On Monday, January 23, 2017, on a secret basis—let alone without any reasoned explanation, notice or solicitation of public comment—APHIS's Chief of Regulatory Analysis and Development submitted a letter to Oliver Potts, Director of OFR, requesting the withdrawal of the Final Rule, which was "currently on public inspection and scheduled to publish in the Federal Register on January 24, 2017" (hereinafter the "Withdrawal Request").  HSUS was subsequently able to obtain a copy of this letter, attached as Exhibit D.

96.     Presumably based on the Withdrawal Request, OFR did not publish the Final Rule in the Federal Register as scheduled on January 24, 2017.  OFR subsequently updated the January 19, 2017 online Public Inspection Issue to read:  "Editorial Note: APHIS requested the withdrawal of this document after it was on public inspection.  It will remain on public inspection until the

close of business on January 24.  A copy of the withdrawal request is available at the Office of the Federal Register."

97.     On or about January 24, 2017, USDA removed the text of the Final Rule Press Release from its website, replacing the text with an announcement of the withdrawal (the "Withdrawal Announcement," attached as Exhibit E).  The announcement reads:  "On January 13, APHIS announced a final rule, making changes to the Horse Protection Act regulations.  That final rule has been withdrawn, in accordance with a memorandum issued to Federal agencies January 20, to ensure the new policy team has an opportunity to review it.  This is similar to procedures issued by previous administrations."  As of August 13, 2019, the Final Rule and the Withdrawal Announcement remain posted for public viewing on the USDA website; however, as discussed below, subsequent actions and communications by USDA and APHIS indicate that the Withdrawal Request is not accurate or genuine, and instead, USDA and APHIS have not engaged in any substantive review process of the Final Rule, but instead, have simply decided to repeal it and ignore the long prior history demonstrating the gross inadequacies of the HIO-administered system, apparently hoping that their illegal action will go unchallenged and unchecked.

### USDA Has Placed The Repealed Final Rule On "Inactive Status"

98.     On information and belief, USDA and APHIS have not cancelled the Withdrawal Request or resubmitted the Final Rule for publication in the Federal Register.  APHIS has not enforced any of the provisions of the Final Rule.  The withdrawal of the Final Rule from publication in the Federal Register, along with USDA's and APHIS's refusal to enforce any of the mandates of the Final Rule, together constitute a repeal of the Final Rule.

99.     On March 23, 2018, following multiple attempts to engage APHIS to discuss its repeal of the Final Rule, HSUS wrote to USDA regarding the status of the Final Rule.  In a letter

dated May 7, 2018, APHIS Administrator Kevin Shea acknowledged that the Final Rule is now on the "list of inactive actions" published by the Office of Management and Budget ("OMB"). Mr. Shea stated that APHIS included the Final Rule on OMB's "list of inactive actions" pursuant to Executive Order 13771, which was issued by the Trump Administration on January 30, 2017, and ordered agencies not to promulgate new regulations without offsetting their costs by the repeal of at least two existing regulations. Mr. Shea wrote that, under the mandate of Executive Order 13771, other "competing priorities" prevent APHIS from completing the HPA rulemaking process, specifically: (a) amendments to procedures for applying for licenses and renewals under the Animal Welfare Act (AWA); and (b) amendments to AWA license requirements to exempt small dealers and exhibitors. Mr. Shea wrote that "[e]xpediting action on the HPA rulemaking would shift resources" away from these "priority rulemakings." As of August 13, 2019, APHIS has proposed the former regulation, and completed the final amendments to the AWA license requirements. Mr. Shea wrote: "Instead of actively working on the HPA final rule at this time, USDA has continued to promote HPA compliance by building alignment in the inspection processes of our inspectors and of DQPs . . . ." Mr. Shea's letter is attached as Exhibit F.

100.    On February 28, 2019, the United States Equestrian Foundation ("USEF") wrote to the Secretary urging the Secretary to publish the Final Rule. In a letter dated April 18, 2019, Secretary of Agriculture Sonny Perdue acknowledged a written request to publish the Final Rule but did not state any intentions with regard to the Final Rule. Instead, he wrote: "We are [] working closely with [HIOs] and [DQPs] to ensure that HPA inspection processes and findings are consistent whether USDA is present at events or not. . . . We believe continuing with these initiatives will bring us closer to achieving the HPA's dual purposes of ending soring and promoting fair competition." Neither the Shea Letter nor the Perdue Letter addresses the inherent

conflict of interest within the HIO-administered scheme with licensed DQP inspectors that Final Rule was designed to eliminate, nor address its prohibitions on action devices, pads and wedges regarded as "necessary" to achieve the HPA mandate to end horse soring.

101.    On June 7, 2019, representatives of HSUS, along with representatives from other organizations, attended a meeting at USDA headquarters in Washington, D.C. with Bernadette Juarez, who at the time held the position of APHIS Deputy Administrator for Animal Care, which is the office within APHIS charged with overseeing the HPA.  During this meeting, Ms. Juarez characterized the Final Rule as long-term inactive, with USDA and APHIS having no present intention to move forward on it.

102.    As of August 13, 2019, USDA has not placed the repealed Final Rule on OMB's Unified Regulatory Agenda for any portion of 2017, 2018, or 2019.  Instead, the Final Rule can be found   on   the   "inactive"   list   available   at   https://www.reginfo.gov/public/do/eAgen daInactiveSearchResult?viewall=y.

### *Horse Soring Continues Today Despite*
### *HPA's Nearly 50-Year Statutory Mandate To End It*

103.    According to the limited data published by APHIS, it is clear that widespread soring continues through the present—and in fact may be becoming even more prevalent.  The total number of violations identified were almost twice as high in 2018 as in 2017.  *See* ANIMAL AND PLANT HEALTH INSPECTION SERV., USDA HORSE PROTECTION PROGRAM: FY 2018 QUARTER 1- QUARTER 3 HORSE INDUSTRY ORGANIZATION (HIO) INSPECTION DATA, https:// www.aphis.usda.gov/animal_welfare/downloads/hp/FY2018_Q1-3_HPA_HIO_Inspection_Data _Summary_Report_Card.pdf (last visited Aug. 6, 2019); ANIMAL AND PLANT HEALTH INSPECTION SERV., USDA HORSE PROTECTION PROGRAM, FY 2017 HORSE INDUSTRY ORGANIZATION (HIO) INSPECTION DATA, https://www.aphis.usda.gov/animalwelfare/downloads/hp/fy17-hio-inspection

-data.pdf (last visited Aug. 6, 2019).  Yet, this increase in violations was almost entirely the result of additional violations identified when USDA VMOs were present and observing DQP inspections:  DQPs were almost three times as likely to issue citations when VMOs were present than when they were absent.  *See id.*  This is notable given that exhibitors frequently leave horse shows with their horses when they become aware that VMOs have arrived, leaving fewer horses available for inspection.   Thus, the rate of violations observed when VMOs are present underrepresents the extent to which soring occurs.  Moreover, VMOs attend only a fraction of the shows held throughout the year—64 in the first three quarters of 2018 and 52 in 2017.  *See* ANIMAL AND PLANT HEALTH INSPECTION SERV., FY2018 USDA HORSE PROGRAM ACTIVITY REPORT, https://www.aphis.usda.gov/animal_welfare/downloads/hp/FY2018-Horse-Program-Activity-Report.pdf (last visited Aug. 6, 2019).

104.    Certain HIOs have also failed to find any violations when VMOs are not present at horse shows.  "SHOW" (or "Sound Horses, Honest Judging, Objective Inspections, Winning Fairly"), an HIO that, according to APHIS, has the best record of detecting violations, found violations in only 4.3% of inspections when VMOs were absent versus 9.4% when VMOs were present—more than double the percentage of violations.  *See* ANIMAL AND PLANT HEALTH INSPECTION SERV., *supra* USDA HORSE PROTECTION PROGRAM: FY 2018 QUARTER 1- QUARTER 3 HORSE INDUSTRY ORGANIZATION (HIO) INSPECTION DATA.  APHIS nevertheless opted not to send VMOs to some of the largest shows in the industry if SHOW was conducting the inspections, including the May 23–25, 2019 "Fun Show" in Shelbyville, Tennessee, which is one of the three largest shows for Big Lick horses.

105.    A large percentage of horse show entrants continue to test positively for certain chemicals associated with soring.  In 2017, APHIS reported that 58.2 percent of Big Lick horses

tested positive for banned chemicals; in 2018, 66.15 percent of such horses tested positive.  *See* ANIMAL AND PLANT HEALTH INSPECTION SERV., USDA APHIS HORSE PROTECTION PROGRAM: PROHIBITED SUBSTANCE REPORT (2017), https://www.aphis.usda.gov/animal_welfare/hp/downloads/prohibited-substance-reports/fy17-prohibited-substance-report.pdf; ANIMAL AND PLANT HEALTH INSPECTION SERV., USDA APHIS HORSE PROTECTION PROGRAM: PROHIBITED SUBSTANCE REPORT (2018), https://www.aphis.usda.gov/animal_welfare/hp/downloads/prohibited-substance-reports/2018/FY18-Prohibited-Substance-Report.pdf.

## FIRST CAUSE OF ACTION

### (Violation of the APA – Unlawful Repeal of the Final Rule Without Notice and Comment)

106.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

107.    The Final Rule constituted a final agency action and was duly issued, prescribed or promulgated by USDA under the APA and the HPA.

108.    In requesting that OFR withhold the Final Rule from Federal Register publication after it had been placed on public inspection and subsequently refusing to enforce its requirements, USDA and APHIS have unlawfully repealed the Final Rule in violation of the APA's requirements for due process, including a notice proposing such repeal, with a reasoned explanation for its basis and the opportunity for public comment.  *See* 5 U.S.C. § 553.

109.    USDA's repeal of the Final Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), and was "without observance of procedure required by law," *id.* § 706(2)(D).

## SECOND CAUSE OF ACTION

### (Violation of the APA – Unlawful Change in Agency Position Without Reasoned Explanation)

110.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

111.    The Final Rule reflected the culmination of the rulemaking process, including "consideration" of the "written data, views, or arguments" of interested persons and "a concise general statement of [the Final Rule's] basis and purpose." *See* 5 U.S.C. § 553(c).

112.    APHIS concluded in the Final Rule that the HPA Regulations were inadequate to prevent horse soring and must be amended to achieve the HPA's statutory mandate to end horse soring.

113.    By requesting OFR not to publish the Final Rule and then subsequently refusing to enforce its requirements, USDA and APHIS have unlawfully repealed the Final Rule without providing any reasoned explanation for their change in position.  USDA's and APHIS's actions resulted in reversal of the legal, policy and factual findings that necessitated the adoption of the Final Rule, without any reasoned explanation to support that reversal.  Such actions, therefore, are fundamentally and without question "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

### (Violation of the APA – Moving The Final Rule To "Inactive Status" Without Notice and Comment or a Reasoned Explanation)

114.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

115.    The Final Rule constituted a final agency action, was duly issued, prescribed or promulgated by USDA under the APA and the HPA, and reflected the culmination of the

rulemaking process, including "consideration" of the "written data, views, or arguments" of interested persons and "a concise general statement of [the Final Rule's] basis and purpose." *See* 5 U.S.C. § 553(c).

116.    In moving the Final Rule to "Inactive Status" without providing any reasoned explanation for doing so, and without notice and comment, USDA and APHIS have violated 5 U.S.C. §§ 553, 706(2).

117.    Such action also was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), and was "without observance of procedure required by law," *id.* § 706(2)(D).

## FOURTH CAUSE OF ACTION

**(Violation of the FRA and APA – Allowing Withdrawal of a Duly-Issued, Prescribed or Promulgated Final Rule for a Reason other than Error Correction and Failing to Publish the Final Rule in the Federal Register in Accordance with OFR's Regulations)**

118.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

119.    By failing to publish the Final Rule after it was posted for public inspection for a reason other than error-correction, OFR exceeded its statutory authority under the FRA and its own regulations.

120.    By assigning a publication date of Tuesday, January 24, 2017, instead of Monday, January 23, 2017, OFR violated its own regulations.  This violation was not without prejudice:  By assigning a publication date of January 24, OFR allowed APHIS an extra day after the federal government was closed on Friday, January 20, 2019, for the Inauguration to request that the Final Rule not be published in the Federal Register.

121.    OFR's failure to publish the Final Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the FRA, 44 U.S.C. §§ 1501-10, and associated regulations, 1 C.F.R. Parts 17 and 18]." 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION

**(Violation of the HPA and APA – Repealing The Duly-Issued, Prescribed or Promulgated Final Rule And Leaving In Place The HPA Regulations That Fail To Do What Is "Necessary" To Achieve The HPA's Statutory Mandate To End Horse Soring)**

122.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

123.    The HPA contains broad and comprehensive prohibitions on horse soring that clearly impose a statutory mandate to end it.  *See* 15 U.S.C. § 1824 ("Unlawful Acts").

124.    USDA and APHIS are required by the HPA to issue "rules and regulations" "necessary to carry out the provisions of this chapter."   15 U.S.C. § 1828   ("Rules and Regulations").

125.    By repealing the Final Rule and leaving in place the HPA Regulations long-recognized as wholly inadequate to prevent horse soring, USDA and APHIS are acting contrary to the statutory mandate of the HPA to end horse soring and exceeding the authority granted by the HPA.  This constitutes agency action inconsistent with its statutory obligations, and thus is "an abuse of discretion, or otherwise not in accordance with [the HPA]." 5 U.S.C. § 706(2)(A).

## REQUESTS FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment as follows:

A.    Declaring that USDA's withdrawal of the Final Rule without a reasoned explanation, notice or an opportunity for public comment violates the APA and HPA;

B.    Vacating USDA's repeal of the Final Rule;

C.      Declaring that OFR abused its discretion or exceeded its statutory authority when

it failed to publish the Final Rule and permitted USDA to withdraw the Final

Rule;

D.      Vacating OFR's decision to comply with USDA's withdrawal request;

E.      Compelling publication of the Final Rule in the Federal Register;

F.      Awarding Plaintiffs their costs and reasonable attorneys' fees; and

G.      Granting such other relief that the Court considers just and proper.

Respectfully submitted this 13th day of August, 2019.

*/s/Claudia M. O'Brien*_____
Claudia M. O'Brien (D.C. Bar No. 447354)
Julia A. Hatcher (D.C. Bar No. 412755)*
Laura J. Glickman (D.C. Bar No. 995597)
Kelly Z. Walters (D.C. Bar No. 1023492)*
James D. Friedland (Ill. Bar. No. 6322526)**
Julianne C. Brauer (N.Y. Bar No. 5609177)**
Sally Meyer Cohen (Ill. Bar. No. 6326730)**
Tyler S. Williams (D.C. Bar No. 888242297)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
julia.hatcher@lw.com
claudia.obrien@lw.com
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

*Admission forthcoming
**Appearance forthcoming

Kimberly D. Ockene (D.C. Bar No. 461191)
Ralph E. Henry (D.C. Bar No. 982586)
The Humane Society of the United States
1255 23rd Street, NW
Washington, DC 20037
kockene@humanesociety.org
Telephone: (202) 285-1388
Facsimile: (202)778-6134

*Attorneys for Plaintiffs*