## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**HUMANE SOCIETY OF THE** )
**UNITED STATES**, *et al.*, )
)
    **Plaintiffs,** )
)
       **v.** )   **Civil Action No. 19-cv-02458 (ESH)**
)
**UNITED STATES DEPARTMENT** )
**OF AGRICULTURE**, *et al.*, )
)
    **Defendants.** )
_____ )

### MEMORANDUM OPINION

Before the Court is a Motion to Dismiss brought by defendants the United States Department of Agriculture ("USDA"); the Animal and Plant Health Inspection Service ("APHIS"); the Office of the Federal Register ("OFR"); Sonny Perdue, in his official capacity as Secretary of Agriculture; Kevin Shea, in his official capacity as APHIS Administrator; and Oliver Potts, in his official capacity as Director of the OFR (collectively, "defendants"). Defendants argue that plaintiffs (the Humane Society of the United States ("HSUS"), the Humane Society Legislative Fund ("HSLF"), and four individuals) lack standing to bring this action and that their claims fail as a matter of law. For the reasons set forth herein, the defendants' motion will be granted.

### BACKGROUND

#### I.    FACTUAL BACKGROUND

##### A.    Horse Protection Act and Associated Regulations

The Horse Protection Act (the "HPA"), *see* 15 U.S.C. § 1821 *et seq.*, passed in 1970 and

1

amended in 1976, "outlaws the practice of horse soring, an inhumane practice of causing pain to a horse's foot or leg to produce a more desirable gait." (*See* Mem. in Support of Mot. to Dismiss ("Mot. to Dismiss") at 1, ECF No. 18-1.)  Congress empowered the Secretary of Agriculture to issue rules and regulations to implement the provisions of the Act.  *See* 15 U.S.C. § 1828.  The Secretary exercised this authority soon after the HPA's 1976 amendments and, through APHIS, "promulgated regulations governing inspections to detect the use of devices, equipment and chemical substances that cause soring and those that attempt to mask it, and enforcement in the event of such detection." (*See* Compl. ¶ 3 (citing 9 C.F.R. § 11.1 *et seq.*), ECF No. 1.)

Under the regulations, "no chain, boot, roller, collar, action device, nor any other device, method, practice, or substance shall be used with respect to any horse at any horse show, horse exhibition, or horse sale or auction if such use causes or can reasonably be expected to cause such horse to be sore." 9 C.F.R. § 11.2(a).  The regulations also ban certain categories of devices in all situations.  *See id.* § 11.2(b) (banning, *inter alia*, "[c]hains weighing more than 6 ounces each," and "[c]hains with links that are not of uniform size, weight and configuration").  Furthermore, they permit Horse Industry Organizations ("HIOs"), defined by the regulations as "organized group[s] of people, having a formal structure, who are engaged in the promotion of horses through the showing, exhibiting, sale, auction, registry, or any activity which contributes to the advancement of the horse," *id.* § 11.1, to "hire and license private individuals known as Designated Qualified Persons ('DQPs') to perform inspections and . . . assess and enforce penalties (and administer appeals of those penalties) of any horse soring identified by DQPs." (Compl. ¶ 3.)  While the HIOs carry out the licensure of DQPs, the regulations provide certain minimum requirements for the licensing process and require that DQPs be either Doctors of Veterinary Medicine with equine experience or "[f]arriers, horse trainers, and other

knowledgeable horsemen" with relevant experience who have been trained and licensed by an HIO.  *See* 9 C.F.R. § 11.7.

This regulatory system for detecting and preventing horse soring has been criticized by some, including plaintiffs, for "allowing the horse industry to regulate itself" through HIOs, as well as "fail[ing] to prohibit certain devices, equipment and foreign substances that have no legitimate purpose other than to cause horse soring."  (*See* Compl. ¶ 3.)  A 2010 report by the USDA's Office of the Inspector General ("OIG") found that DQPs, who are hired by the HIOs to enforce the HPA, "are reluctant to issue violations since excluding horses from the show inconveniences their employers, and makes it less likely they will be hired for other shows." (*See id.* (citing U.S. Dep't of Agriculture, Audit Report 33601-2-KC (2010), https://www.usda.gov/oig/webdocs/33601-02-KC.pdf (hereinafter "OIG Report")).)  Moreover, DQPs "are also subject to a conflict of interest because, while they are acting as a DQP at one show, they may be an exhibitor at another show, and the exhibitor of the horse they are examining might later act as the DQP."  (*Id.*)

As a result of this system, the individual plaintiffs allege that they are currently unable "to attend walking horse shows and participate in the walking horse industry without the pain of knowing horses [are] being sored."  (*See, e.g., id.* ¶ 20.)  They allege that they have largely withdrawn from the walking horse show community because "it [i]s impossible for sound horses to compete in the industry," and as a result they have lost clients due to their own refusal to sore horses, or they had their own horses sored against their wishes.  (*See, e.g., id.* ¶¶ 19, 20.)

### B.    2016 Rulemaking and 2017 Withdrawal

As noted above, in 2010 the USDA's OIG published a report that concluded that "APHIS' program for inspecting horses for soring is not adequate to ensure that these animals

are not being abused."  *See* OIG Report at 1.  In particular, the OIG "found that DQPs do not

always inspect horses to effectively enforce the law and regulations, and in some cases where

they do find violations, they deliberately issue tickets [*i.e.*, for violations of the Act] to friends or

family members of responsible individuals so that the responsible person could avoid receiving a

penalty for violating the Horse Protection Act."  *Id.*  The report "recommend[ed] that APHIS

abolish the DQP program, and instead provide independent, accredited veterinarians to perform

inspections at sanctioned shows."  *Id.* at 3.

During the next several years following the release of the OIG Report, plaintiff HSUS

petitioned the USDA to amend its HPA regulations.  (*See* Compl. ¶¶ 72-74.)  In 2016, APHIS

published a proposed rule that "would replace the HIO-administered scheme with USDA-

licensed inspectors and would prohibit certain devices, equipment and foreign substances with

no legitimate purpose other than to cause horse soring."  (*See* Compl. ¶ 4); *see also* 81 Fed. Reg.

49,112 (July 26, 2016).  The proposed rule would "provide that [APHIS would] train and license

Designated Qualified Persons (DQPs) to inspect horses at horse shows, exhibitions, sales, and

auctions for compliance with the Horse Protection Act."  81 Fed. Reg. at 49,112.  APHIS

acknowledged the OIG Report and "agree[d] with OIG's conclusion that the current program of

HIOs training and licensing DQPs is not adequately detecting instances of soring."  *Id.* at 49,115.

The proposed rule also "prohibit[ed] the use of pads, action devices, and substances."  *Id.* at

49,117.

"On January 11, 2017, David Howard, the Acting Deputy Under Secretary for Marketing

and Regulatory Programs signed a document summarizing the outcome of the notice and

comment procedures and explaining forthcoming changes to USDA's HPA regulations[,] . . . and

sent the document to the OFR for publication as a 'Final Rule.'"  (Mot. to Dismiss at 8.)  This

document, which the Court refers to as the "2017 Rule," provided that much of it would become effective on January 1, 2018.  (*See* Compl. ¶ 84.)  However, two sections, which banned action devices and eliminated the HIO training program while imposing new inspector requirements, would become effective thirty days after publication in the Federal Register.  (*See id.*)  "OFR posted the [2017 Rule] for 'public inspection' on Thursday, January 19, 2017, and assigned a publication date of Tuesday, January 24, 2017."  (*Id.* ¶ 93.)

However, the 2017 Rule was never published in the Federal Register.  After OFR posted the Rule for public inspection, but before it was published, President Donald Trump was sworn into office.  On Inauguration Day, January 20, 2017, "President Trump's Chief of Staff Reince Priebus issued a memorandum directed to agency heads entitled, 'Regulatory Freeze Pending Review.'"  (*Id.* ¶ 94.)  This memorandum directed all agencies to immediately withdraw any rule that was at the OFR but had not yet been published in the Federal Register.  (*See id.* (citing Memorandum from The White House to the Heads of Executive Departments and Agencies (Jan. 20, 2017), https://www.whitehouse.gov/presidential-actions/memorandum-heads-executive-departments-agencies/).)  As a result, on January 23, 2017, the USDA sent a letter to the OFR requesting that the 2017 Rule be withdrawn from the public docket and not be published.  (*See* Mot. to Dismiss at 8 (citing Letter to Oliver Potts, Ex. D, ECF No. 1-4).)  The 2017 Rule is now listed on the USDA's list of "inactive" rulemakings.  (*See id.* at 9.)  In a 2018 letter, the USDA explained that the rulemaking was listed as inactive while the Department focused on higher-priority actions, namely several rulemakings under the Animal Welfare Act.  (*See id.* at 9-10.)

## II.   PROCEDURAL HISTORY

Plaintiffs filed their complaint on August 13, 2019.  They request declaratory and injunctive relief, and bring five causes of action: (1) unlawful repeal of the 2017 Rule without

notice and comment, in violation of the Administrative Procedure Act ("APA"); (2) unlawful

change of agency position, in violation of the APA; (3) movement of the 2017 Rule to "inactive"

status without notice and comment or reasoned explanation, in violation of the APA; (4)

withdrawal of a rule for reasons other than error correction and subsequently failing to publish it,

in violation of the APA, the Federal Register Act ("FRA"), and OFR regulations; and (5) repeal

of the 2017 Rule, thereby leaving the prior regulatory regime in place, in violation of the APA

and HPA's mandate to reduce horse soring.  (*See* Compl. ¶¶ 106-25.)  Defendants filed the

instant motion to dismiss on October 18, 2019, arguing that plaintiffs lack standing to bring their

claims, and that their claims fail as a matter of law.

## ANALYSIS

### I.    LEGAL STANDARD

Defendants move to dismiss plaintiffs' complaint for lack of subject matter jurisdiction,

pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim upon which

any relief can be granted, pursuant to Rule 12(b)(6).  At this stage, a court must "construe the

complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the

facts alleged."  *See Barr v. Clinton*, 370 F.3d 1196, 1999 (D.C. Cir. 2004) (internal quotation

marks omitted).  "However, the court need not accept inferences drawn by plaintiffs if such

inferences are unsupported by the facts set out in the complaint[,] . . . [n]or must the court accept

legal conclusions cast in the form of factual allegations."  *Kowal v. MCI Commc'ns Corp.*, 16

F.3d 1271, 1276 (D.C. Cir. 1994).

### II.   STANDING

#### A.    Legal Framework

The "irreducible constitutional minimum of standing," which is "an essential and

unchanging part of the case-or-controversy requirement of Article III," contains three elements: (1) injury-in-fact; (2) traceability between the complained-of action and the injury; and (3) likely redressability by a court granting the requested relief.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "The party invoking federal jurisdiction bears the burden of establishing these elements."  *Id.* at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

"An organization may assert standing on its own behalf or on behalf of its members." *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).  An organization asserting standing on its own behalf must allege the same three elements required of individuals.  *See id.*  "Associational standing," on the other hand, requires that "(1) at least one of their members would have standing to sue; (2) the interests they seek to protect are germane to the organizations' purposes; and (3) neither the claim asserted nor the relief requested requires the participation of individual members."  *Sierra Club v. EPA*, 754 F.3d 995, 999 (D.C. Cir. 2014).

### B.    Analysis

Defendants challenge only the causation and redressability prongs of plaintiffs' standing.[1]

---

[1] With the exception of plaintiffs' fourth cause of action, which is based on the FRA and OFR regulations, defendants do not argue that plaintiffs have failed to allege an injury-in-fact. (*Compare* Mot. to Dismiss at 13 *with id.* at 25-26.)  While the Court cannot assume injury-in-fact simply because neither party has contested it, the Court concludes that at least one plaintiff has alleged an injury-in-fact due to the complained-of actions by defendants.  *See Ameren Servs. Co. v. FERC*, 893 F.3d 786, 791 (D.C. Cir. 2018) ("The presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." (internal quotation marks and brackets omitted)).  For example, several of the individual plaintiffs have ceased participating in the showing and business of walking horses due to the failure of defendants to reduce the

"Typically, redressability and traceability overlap as two sides of a causation coin" and, as a result, are treated as "closely related." *Dynalantic Corp. v. Dep't of Defense*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).  Nevertheless, they are distinct.  "[C]ausation focuses on the connection between the assertedly unlawful conduct and the alleged injury whereas redressability focuses on the connection between the alleged injury and the judicial relief requested." *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017).  Since the assertedly unlawful conduct (failing to publish the 2017 Rule) and the judicial relief requested (publication of the 2017 Rule) completely overlap, the two elements of standing are even more closely intertwined here.

First, defendants argue that "the entirely speculative chain of causation that would be required to connect [the injuries] alleged with the withdrawal of the [2017 Rule] is insufficient to establish standing."  (Mot. to Dismiss at 13.)  They contend that the connection between the publication and finalization of the 2017 Rule and the reduction or elimination of plaintiffs' harms relating to horse soring is "simply too tenuous to support causation." *Californians for Renewable Energy v. U.S. Dep't of Energy*, 860 F. Supp. 2d 44, 52 (D.D.C. 2012).  The 2017 Rule would accomplish two primary objectives: (1) it would abolish the current system of HIO licensure and require all horse inspectors to be licensed by the USDA and APHIS, and (2) it would ban many more devices and substances often used in horse soring.  The OIG Report refutes defendants' claim that there is no "evidence that the new changes would actually alleviate the perceived problems" in the inspector licensing regime.  (*See* Mot. to Dismiss at 14.)  For example, the OIG Report reviewed APHIS records over several years and "found that DQPs are much more likely to find evidence of soring when APHIS employees are present than when they are not," ostensibly because of the inherent conflict of interest faced by DQPs who are trained,

---

prevalence of soring.  (*See, e.g.,* Compl. ¶¶ 18-21.)

hired, and paid by the system they are supposed to police. *See* OIG Report at 11. The 2017 Rule, on the other hand, would have put in place conflict-of-interest requirements to prevent individuals heavily involved in the walking horse industry from also participating in the inspection process, and would have required that inspectors be veterinarians, "who would suffer reputational damage and could lose not only their HPI license but even their veterinary license if they fail to enforce the HPA." (*See* Pls.' Opp. at 16, ECF No. 23.) Defendants are correct that some current DQPs could also have qualified as inspectors under the 2017 Rule, and that the shows are still responsible for the hiring of—and therefore the choice of *who* to hire as— inspectors. (*See* Mot. to Dismiss at 14.) However, the causal chain here is not nearly as attenuated as in cases where standing was found to be lacking, such as *Californians for Renewable Energy*, in which the harm the plaintiffs described was "affected by a variety of factors, not the least of which is market forces entirely outside [the defendant's] control." 860 F. Supp. 2d at 52. Moreover, the fact that the 2017 Rule would not have definitively and completely addressed plaintiffs' injuries does not mean that causation is lacking. *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008) (concluding that the plaintiffs had established standing even if the defendant's action only redressed the plaintiffs' injuries "in part").

Defendants also criticize plaintiffs' contention that the ban on action devices and lubricants would affect the prevalence of soring, noting that the current regulations already ban any device or substance that causes horses to be sore. (*See* Reply at 5, ECF No. 25.) However, as plaintiffs point out, "these devices are all highly visible," meaning that if they are *completely* banned (rather than simply banned when causing soreness), enforcement will be much simpler and therefore likely more effective. (*See* Pls.' Opp. at 20 (internal citation omitted); *see also id.*

at 21 ("In these ways, the [2017 Rule's] bans would eliminate the most common mechanisms for both soring and avoiding detection of soring, and remove much ambiguity from the inspection process by making violations readily apparent — either an action device is there, or it is not; either a substance is there, or it is not.").)  Plaintiffs' contentions are shored up by the findings in the proposed rulemaking, which stated that APHIS had found "that a relationship exists between the use of such items [*i.e.*, action devices] and soring in horses" and that, as a result, "to successfully and significantly reduce the number of sored horses . . . [the Secretary and APHIS were] proposing to prohibit the use of pads, action devices, and substances."  *See* 81 Fed. Reg. 49,117.

Second, defendants argue that plaintiffs' injuries would be redressed only by the elimination of soring altogether.  (*See* Mot. to Dismiss at 15 ("Although the precise degree of reduction is uncertain, it clearly must be significant in light of the allegations in the Complaint.").)  Defendants point to the fact that "[e]very one of the named Plaintiffs alleges that their injuries would only be remedied if they were able 'to attend walking horse shows and participate in the walking horse industry *without the pain of knowing horses were being sored*.'" (*See id.* (quoting Compl. ¶¶ 18-21) (emphasis in original).)  However, the Court does not read this, as defendants urge it to, as requiring that "the reduction in horse soring . . . be so significant that [plaintiffs] did not believe that it continued to occur" (*see id.* at 16); to the contrary, as plaintiffs claim, the current HPA regulations have "created an *expectation* that horses will be sored and a reality in which it is difficult to win otherwise."  (*See* Pls.' Opp. at 10 (emphasis in original).)  Finding redressability does not require the Court to predict "future actions to be taken by third parties."  *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (internal quotation marks omitted).  Passage of the 2017 Rule would have created a more rigorous inspection regime and

an easier-to-enforce ban on devices and substances, which would likely have resulted in a reduced incidence of soring, where soring would no longer be "the norm." (*See* Pls.' Opp. at 11.)  For example, that plaintiffs' desire to no longer "know[]" that horses were being sored would be redressed by passage of the 2017 Rule is particularly evident when considering the ban on action devices—"action devices, pads and wedges are visual markers that indicate horse soring has and is occurring, and would all but disappear under the" 2017 Rule. (*See id.* at 11, 12.)  In sum, plaintiffs have effectively alleged that failure to pass the 2017 Rule is causing their injuries, and that their injuries would be redressed by the passage of the Rule.  As a result, the Court concludes that they have standing to bring their claims.

## III.    APA CLAIMS

### A.      Failure to Publish the 2017 Rule

Plaintiffs first argue that defendants violated the APA by unlawfully repealing the 2017 Rule and changing their position without notice and comment.  Notice and the opportunity to comment is required by the APA for all rulemakings.   *See* 5 U.S.C. § 553(b)-(c).  Moreover, the APA's definition of "rulemaking" includes the "agency process for formulating, amending, or *repealing* a rule."  *See id.* § 551(5).  Of course, this prescription applies only to final, legislative rules.  *See Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 171 (D.D.C. 2008) ("[A]n amendment to a legislative rule must itself be legislative and therefore subject to notice and comment requirements." (internal quotation marks omitted)).  And up until a rule's finalization, "[a]n agency is free to adjust or abandon [its] proposals in light of public comments or internal agency reconsideration without having to start another round of rulemaking."  *Ass'n of Oil Pipe Lines v. FERC*, 83 F.3d 1424, 1432 (D.C. Cir. 1996) (internal quotation marks omitted); *see also Rowell v. Andrus*, 631 F.2d 699, 702 n.2 (10th Cir. 1980)

(noting that "[a]t the point of publication of the proposed rule the agency is, of course, not bound to the issuance of the rule in any exact form," and that it could "scuttle the whole proposal" if it so chose).  These basic tenets of administrative law are not at issue—instead, the parties' disagreement centers on when a rule officially becomes final such that it cannot be withdrawn without notice and comment.  Based on statutory considerations, *see* Section III.A.1, *infra*, and the relevant case law, *see* Section III.A.2, the Court concludes that in a case where the agency does not consider a rule to be finalized, and the rule has not been published in the Federal Register, it does not constitute a finalized, legislative rule.  As a result, the defendants did not violate the APA when they failed to publish the 2017 Rule, as it was not a final rule requiring notice and comment rulemaking prior to its alleged repeal.

### 1.        Statutory Framework

As plaintiffs rightly observe, the APA—which also comprises the subsequently-enacted Freedom of Information Act ("FOIA")—states that a generalized statement of a proposed rulemaking "shall be published" in the Federal Register, *see* 5 U.S.C. § 553(b), but includes no similar requirement of publication in its description of the rulemaking process for finalized rules. On the other hand, the APA *does* state that the "required publication" of a rule may not be less than 30 days before a rule's effective date, *see id.* § 553(d), and that an agency "shall separately state and currently publish in the Federal Register" its legislative rules.  *Id.* § 552(a)(1).

These relatively bare-bones requirements provide little explicit guidance on the finality of agency rules.  However, a number of cases have read these provisions as meaning that publication is *required* for the finality of a rule.  *See, e.g., NRDC v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009) ("Agencies must publish substantive rules in the Federal Register to give them effect.").  In fact, it is often taken for granted as a "basic tenet of administrative law, set out by

the APA," that regulations do not take effect until they are published in the Federal Register.  *See*

*NRDC v. NHTSA*, 894 F.3d 95, 106 (2d Cir. 2018).

If the APA requires that all rules shall be published in the Federal Register, it logically

follows that the statute must have intended for the "required publication" to mean publication in

the Federal Register.  Plaintiffs, on the other hand, argue that "the 'purpose' of the publication

requirement in FRA 'is to make sure that persons may find the necessary rules'" (Pls.' Opp. at 25

(quoting *United States v. Aarons*, 310 F.2d 341, 348 (2d Cir. 1962)), meaning that the statute was

concerned with constructive notice rather than the finality of agency rules.  However, the Court

concludes that the APA's allowance for actual notice, rather than constructive notice, is more

aptly described as "an express exception" to "552(a)(1)'s publication *requirement*."  *See Texas*

*Alliance for Home Care Servs. v. Sebelius*, 811 F. Supp. 2d 76, 103 (D.D.C. 2011) (emphasis

added).

As a result, the fact that the APA allows unpublished rules to be enforced against

individuals on notice of the rule, *see Aarons*, 310 F.2d at 348, does not change the Court's

conclusion that publication is required for finality.  In the cases of pre-publication enforcement,

the *agency* continues to treat the unpublished rule as final.  *See* section III.A.2.b, *infra*

(discussing pre-publication enforcement cases and how uniformly, the agency considers the rule

to be final).  The law simply reflects the conclusion that enforcement in such a situation is not

unfair given that the party that is the subject of the enforcement action is on notice of the rule.

*See, e.g., Aarons*, 310 F.2d at 346 (noting, in a situation where a regulation requires knowledge

for criminal liability, "[i]t would be rather anomalous that although publication in the Federal

Register would not have sufficed to create criminal liability in the absence of actual knowledge,

lack of publication should be fatal when actual knowledge exists.").  The APA requires that all

"substantive rules of general applicability adopted as authorized by law" be published in the Federal Register.  *See* 5 U.S.C. § 552(a)(1).  The exemption for enforcement of unpublished rules merely gives agencies flexibility to enforce rules that all parties admit they knew of even if publication had not yet occurred.  *See, e.g., Aarons*, 310 F.2d at 346.

### 2. Case Law

#### a. *Rule Withdrawal Cases*

The case law concerning so-called "midnight rulemakings," and the validity of actions taken by an incoming administration to address them, is sparse.  *See* William M. Jack, *Taking Care That Presidential Oversight of the Regulatory Process is Faithfully Executed*, 54 Admin L. Rev. 1479, 1499 (2002) (noting the "dearth of caselaw analyzing the validity of rule withdrawals" by incoming presidential administrations).  But the one case from the Court of Appeals to address this situation, while not factually identical, supports the government's argument that rules may be withdrawn prior to their publication in the Federal Register.  In *Kennecott Utah Copper Corporation v. United States Department of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996), the Court of Appeals concluded that the Department of the Interior's choice to withdraw a rule at the OFR, and later publish a different rule, did not violate the APA.  The rule in question was at the OFR for "confidential processing," which means that the OFR was reviewing and editing the rule, but it had not yet been released to the public.  *See id.* at 1205.  It was then withdrawn, and a subsequent rule was later published after further notice and comment procedures.  The Court concluded that "the 1994 Regulations did not repeal or modify the 1993 Document for the simple reason that the 1993 Document never became a binding rule requiring repeal or modification."  *Id.* at 1208.  As a result, the withdrawal of the earlier rule was not in violation of the APA.

At least one case to discuss *Kennecott* emphasized that the rule was at the confidential processing stage and had not yet been released to the public.  *See NRDC v. Perry*, 940 F.3d 1072, 1077 (9th Cir. 2019).  In *Perry*, the Ninth Circuit concluded that a rule could *not* be withdrawn, noting that "the regulations at issue in *Kennecott* were never made available for public inspection with the expectation that they would become final, as the rules were here."  *See id.*  However, in *Perry*, the Department of Energy's inability to withdraw the rule was not based on the APA, but on the so-called "error-correction" regulation specific to DOE.  *See id.* at 1080 ("By delaying publication of the four rules beyond the period permitted under the error-correction rule, DOE has violated the nondiscretionary duty imposed by its own regulation.").  As in *Kennecott*, there is no such regulation applicable to the defendants.  *See id.* at 1077 ("[T]here could have been no argument in *Kennecott* that the agency had a mandatory duty to publish the regulations due to anything similar to the error-correction rule.").

Moreover, the Court sees no reason why a rule's withdrawal during the confidential processing period, as opposed to during the period of public inspection—which still precedes final publication—should be reason enough for a different result.  Another Ninth Circuit case, *Chen v. INS*, 95 F.3d 801 (9th Cir. 1996), dealt with a rule that was withdrawn before its publication in the Federal Register.  According to the Ninth Circuit's opinion, President George W. Bush's Attorney General "signed a final rule" on January 15, 1993.  *See id.* at 804.  Upon President Clinton's arrival in office, a memorandum was circulated directing that all non-published regulations to be withdrawn.  But "[t]he January 1993 Rule was scheduled to take effect on the date of publication in the Federal Register."  *Id.*  The *Chen* court concluded that in light of this fact, and as the rule was withdrawn, never published, and never resubmitted, "it has no legal effect and is not binding on this court."  *Id.* at 805.  The court did not clarify at what

stage the 1993 Rule was in the process (*i.e.*, whether it was in confidential processing or had been posted by the OFR for public inspection).  But the fact that the Court acknowledged there was a "signed . . . final rule," citing to an Attorney General Order, demonstrates that the rule was likely available to and known by those outside the Attorney General's Office.  Nevertheless, the court did not conclude that the rule was "final" merely because it had been put out by the government as such.  Rather, the rule was not final because it was not slated to take effect until publication, and it was never published.  *See id.* (noting that a signed document identified as a "final rule" had no binding effect when it was withdrawn prior to publication).

So too here.  Several of the 2017 Rule's provisions were not scheduled to take effect until thirty days after publication in the Federal Register.  *Chen* would counsel that by their terms, these provisions never became effective.  *See id.*  And although other provisions of the 2017 Rule were given a date certain, January 1, 2018, for effectiveness, the Court cannot conclude that this is because the agency intended those provisions to go into effect regardless of whether the 2017 Rule was published.  Instead, it is more likely that the agency recognized that these portions of the rule "would require additional phase-in time."  (*See* Compl. ¶ 84.)  Like in *Chen*, the 2017 Rule "was withdrawn from publication . . . [and] never subsequently published," 95 F.3d at 805, and so it did not become a binding legislative rule requiring further process before it could be changed.  *See also Kennecott*, 88 F.3d at 1208 (concluding that a rule was not unlawfully repealed by subsequent agency actions for "the simple reason that . . . [it] never became a binding rule requiring repeal").

As defendants point out, "[u]nder Plaintiffs' theory, awareness of a signed pre-publication rule would *always* make the rule enforceable."  (*See* Defs.' Reply at 12 (emphasis added), ECF No. 25.)  Plaintiffs cite a press release posted by defendants "titled, 'USDA

Announces Changes Aimed at Ending the Inhumane Practice of Horse Soring,' . . . linking to a PDF with the complete text of the Final Rule, including the label 'Final Rule,' and the authorized signature of the agency." (*See* Pls.' Opp. at 5.)  While this certainly sounds like a conclusion to the agency process, imagine the following situation: the Secretary approves a press release including the so-called "final rule," but later decides the rule requires several changes.  However, despite the Secretary's conclusion that the rule needed changes, the press release was posted on the agency's website for several minutes.  Assuming that at least one person viewed the press release, would the agency be obligated to go forward with publishing the rule as it was posted, merely because it had appeared on the website—however briefly—as "final"?  This cannot be what the APA compels, nor as a matter of policy does it make sense to have such an ill-defined, as opposed to bright-line, test.

### b.  Other Case Law

The remaining cases cited by plaintiffs do not change the Court's conclusion that withdrawal during the public inspection period (like withdrawal during the confidential processing period, as was approved in *Kennecott*) is permissible.  The first category of cases plaintiff point to are a variety of pre-publication, actual-notice cases.  (*See* Pls.' Opp. at 26-27.)  In these cases, courts uniformly hold that for enforcement purposes the unpublished rule is effective as to those individuals who have actual notice.  *See, e.g., Kessler v. FCC*, 326 F.2d 673, 690 (D.C. Cir. 1963).  In fact, plaintiffs state that they "are not aware of *any* case in a comparable procedural posture that was *not* held to be final."  (*See id.* at 27 (emphases in original).)  This is unremarkable given that, as Judge Lamberth stated, "§ 552(a)(1)'s publication requirement is subject to an express exception for actual notice." *Texas Alliance for Home Care Servs.*, 811 F. Supp. 2d at 103.  In these cases, while the rule has for some reason not

yet been published, the *agency* still treats it as final.  As a result, these opinions say nothing

about whether "[any]thing in the text of the FRA, APA, or FOIA suggests that having actual

knowledge of a rule means that the rule is final and effective if the agency does not enforce it as

such."  (*See* Defs.' Reply at 14.)  Here, not only was the 2017 Rule not published, but also the

defendants have *not* treated it as final.  Cases where the agency itself chooses to enforce a rule

cannot be used as support for the proposition that an agency must enforce an unpublished, un-

finalized rule.

A trickier case within this category is *Arlington Oil Mills, Inc. v. Knebel*, 543 F.2d 1092

(5th Cir. 1976), in which the Fifth Circuit concluded that the Secretary of Agriculture violated

the APA by failing to provide notice and an opportunity to comment when he changed 1976

peanut support differentials from the previously announced levels due to pressure from certain

industry groups.  *See id.* at 1100.  Neither the March 1976 announcement, ruled procedurally

valid by the Court, nor the subsequent announcement in July 1976, ruled invalid, were published

in the Federal Register.  The Fifth Circuit rejected the defendants' argument that this meant the

earlier announcement was not final action requiring a formal repeal, stating that "[t]he lack of

formal publication does not preclude the effectiveness of an otherwise valid agency action."  *Id.*

at 1099.  Because all parties knew about, and participated in, the March 1976 announcement's

promulgation, "neither the Department's failure to publish its March 19 announcement in the

Federal Register nor its failure to publish a basis and purpose statement render the announcement

ineffective as to the parties in this litigation."  *Id.* at 1100.  Of course, this is a single, out-of-

circuit opinion that is over forty years old.  Moreover, the result in this decision appears driven

primarily by the Fifth Circuit's concern about the Secretary of Agriculture's behavior—

"[d]epartment officials' repeated assurances that the March 19 announcement would remain in

force . . . effectively prevented the plaintiffs' participation in the decisionmaking process either by offering evidence supportive of its own position or in rebuttal to any contrary positions." *Id.* at 1099.  While all concerned parties were consulted about the March decision, the July decision was driven primarily by just one group of growers attempting to have the Secretary act in their favor.  Here, on the other hand, there were no such machinations.  There were not months of discussions with certain industry participants while others were kept out of the loop by the government's insistence that no rule was changing.  Instead, the 2017 Rule was withdrawn only two weeks after its announcement and before its final publication, as part of a new administration's reconsideration of rulemaking priorities throughout its executive agencies.  The situation at issue in *Arlington Oil Mills* is thus clearly distinguishable from the withdrawal of the 2017 Rule.

The next set of cases cited by plaintiffs have to do with the so-called "race to the courthouse."  *See, e.g., City of Gallup v. FERC*, 702 F.2d 1116, 1118 (D.C. Cir. 1983) ("The parties have given their best effort to the race, employing walkie-talkies, long-distance phone lines, split-second timing and cautious repetition.").  In these cases, parties attempt to file the first petition for review of an agency action so that it may be reviewed in the court of their choice.  *See id.*  While the Court of Appeals recognized in these cases that pre-publication action may be deemed "official action," *see Saturn Airways, Inc. v. Civil Aeronautics Bd.*, 476 F.2d 907, 909 (D.C. Cir. 1973), this was in the context of determining when exactly an agency order was "issued" such that a challenge could properly be initiated under 28 U.S.C. § 2112.  Again, however, these are *not* the sort of cases where an agency has backed away from a previously-announced course of action.  Nor was the Court of Appeals analyzing when a rule becomes final such that it requires a formal repeal under the APA.  The Court thus cannot conclude that these

"race to the courthouse" cases provide any insight into the propriety of a situation in which an agency has chosen to withdraw an unpublished rule.

Plaintiffs next point to what the Court refers to as "quorum cases." (*See* Pls.' Opp. at 28-29.) In these cases, the agency releases a rule (or order), but before it becomes final, the agency loses the necessary quorum for it to be valid. In *National Association of Manufacturers v. NLRB*, 717 F.3d 947 (D.C. Cir. 2013), *overruled on other grounds by Am. Meat Institute v. USDA*, 760 F.3d 18, 23 (D.C. Cir. 2014), for example, the NLRB had a valid quorum at the time its rule was *filed* with the OFR, but by the time the rule was *published*, the Board lacked a quorum. *See id.* at 952-53. Having questioned *sua sponte* whether the lack of a valid quorum was a jurisdictional issue, the Court of Appeals assumed, without deciding, that "the date of filing is the relevant time for determining whether the Board had a valid quorum" and thus there was no issue. *Id.* at 953. This was because "[o]nce the rule was filed with the Office of the Federal Register, the Board had taken all the steps necessary to issue the rule—there was nothing left for the Board to do." *Id.*; *see also Braniff Airways v. Civil Aeronautic Bd.*, 379 F.2d 453, 459 (D.C. Cir. 1967) ("In our view it is plain that once all members have voted for an award and caused it to be issued the order is not nullified because of incapacity, intervening before the ministerial act of service, of a member needed for a quorum") The Court of Appeals' "nothing left for the [agency] to do" language, which could suggest that filing with OFR is the operative moment for finality of a rule, does not square with *Kennecott*'s allowance for withdrawal during the confidential processing period. However, *Kennecott* and *National Association of Manufacturers* looked at "finality" from two very different perspectives. The latter was concerned with an action that the agency continued to stand behind, but may have been without power to do, depending on when the action was construed to have been affected. The Court thus

concludes that when a rule was "issued" for purposes of determining jurisdiction does not determine when a pre-publication rule is final for purposes of the APA.

Plaintiffs' remaining citation fares no better. In *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425 (D.C. Cir. 1982), the Court of Appeals analyzed a FERC rule promulgated under the National Gas Policy Act of 1978, which allowed for either the House of Representatives or the Senate to disapprove of certain FERC rules within thirty days of their passage. *See id.* at 433. In this case, FERC passed a rule, but the House disapproved it; over industry objections, FERC revoked the rule with no further notice and comment procedures. *See id.* at 433-34. But the rule in question there *was* published, and the agency *did* intend for it to be final, absent congressional veto. The conclusion that such a rule—one that was published and considered final by the agency—required notice and comment to be changed or revoked is uncontroversial. There is no similarity between the Court of Appeals' conclusion there that the APA required a formal repeal of FERC's rule and the situation in this case.

### 3. Conclusion

As described above, neither the statutory framework of the APA nor any cases cited by the parties supports a rule that prevents agencies from withdrawing rules prior to their publication in the Federal Register. While the APA does allow for enforcement of unpublished rules against individuals with actual notice, the law *does* require that rules be published. Moreover, the Court is convinced that *Kennecott* controls here, despite the fact that the 2017 Rule was at the public inspection stage, rather than at the confidential processing stage. As was held in *Chen v. INS*, a signed, purportedly final rule that is withdrawn and never published has no legal effect, *see* 93 F.3d at 805, and the Court sees no reason why this would not be true regardless of whether the public is aware of the rule's existence or not. To hold otherwise

"improperly shifts the focus of the statutes away from the decision of the regulating agency . . .

and, instead, to the preferences of outside parties."  (*See* Defs.' Reply at 12.)  And, plaintiffs

point to no factually similar case in which a court required an agency to enforce an unpublished

rule that the agency did not itself wish to enforce.  For all the forgoing reasons, the Court

concludes that the 2017 Rule never became "final" such that the APA required its formal repeal,

and as a result, plaintiffs' first two causes of action must be dismissed.

      **B.**      **Moving the 2017 Rule to the "Inactive" List**

      Plaintiffs next argue that defendants violated the APA by moving the 2017 Rule to the

"inactive list" without notice and comment or reasoned explanation.  Defendants contend that

moving the 2017 Rule to the "inactive list" is not "final agency action" that this Court can review

or, alternatively, that if it does constitute final agency action, it did not violate the APA.  The

Court agrees.

      The APA provides for review of "final agency action."  *See* 5 U.S.C. § 704.  For agency

action to be final, it must (1) "mark the consummation of the agency's decisionmaking process,"

and (2) "must be one by which rights or obligations have been determined, or from which legal

consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks

omitted).  If either prong is lacking, the Court may not review.  *See Soundboard Ass'n v. FTC*,

888 F.3d 1261, 1267 (D.C. Cir. 2018) ("Because each prong of *Bennett* must be satisfied

independently for agency action to be final, deficiency in either is sufficient to deprive [the

plaintiff] of a cause of action under the APA.").  Defendants contend that neither requirement is

met here.

      At the outset, calling something "inactive" by its very terms indicates a non-final

decision, particularly when contrasted with the other label that the 2017 Rule might have been

given—*i.e.*, "completed action."  (*See* Mot. to Dismiss at 23 ("If USDA had made a final decision to 'reverse' their position, as Plaintiffs contend, they could have designated the 2016 Rulemaking as a 'Completed Action,' which includes rulemakings that have been 'withdrawn' or are otherwise at the end of their rulemaking process.").)  Plaintiffs contend that because "USDA communications . . . make clear that the Agency does not intend to remove the [2017 Rule] from the Inactive List" (Pls.' Opp. at 35), placing the action on the "inactive" list amounts to a *de facto* consummation of defendants' decisionmaking process, even if "inactive" would not usually have such a connotation of finality.  (*See id.* at 34-35 (citing *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir. 2016) ("[T]his Court has repeatedly noted the applicable test is not whether there are further administrative proceedings available, but rather whether the impact of the order is sufficiently final to warrant review in the context of the particular case." (internal quotation marks omitted))).)

The Court need not analyze defendants' public statements to determine whether placement of the rule on the "inactive" list is the consummation of the decisionmaking process, however, because it concludes that putting the rule on the "inactive" list is not an action "from which legal consequences will flow."  *See Bennett*, 520 U.S. at 178 (internal quotation marks omitted); *see also Soundboard Ass'n*, 888 F.3d at 1267 (holding that if either prong is missing, agency action is not final).  As concluded above, *see* Section III.A, *supra*, the 2017 Rule never became final.  And, withdrawal of a document that never had any legal effect cannot alter a party's rights or obligations.  *Cf. Kennecott*, 88 F.3d at 1207 (concluding that the agency's "decision to withdraw the document did not alter substantive legal obligations under previously published regulations").[2]  As a result, plaintiffs' third cause of action must be dismissed.

---

[2] Similarly, even if the Court concluded that putting the 2017 Rule on the "inactive" list

## IV.    REMAINING CLAIMS

### A.    Federal Register Act Claim

Plaintiffs argue that the OFR violated the APA, the FRA, and its own regulations by "failing to publish the Final Rule after it was posted for public inspection for a reason other than error-correction" and "assigning a publication date of Tuesday, January 24, 2017, instead of Monday, January 23, 2017."  (Compl. ¶¶ 119, 120.)  Defendants respond with a variety of challenges, arguing that plaintiffs lack standing, that the Court cannot grant relief, and that OFR complied with both statutory and regulatory requirements.

First, the Court concludes that it lacks jurisdiction over plaintiffs' claim regarding 1 C.F.R. §17.2, as plaintiffs have failed to allege injury (or causation) stemming from the purported violation.  1 C.F.R. § 17.2(c) prescribes the "regular schedule for filing for public inspection and publication."  Assuming that the 2017 Rule was assigned to the "regular schedule," it was posted for public inspection on Thursday, January 19, 2017, and should have been scheduled for publication on Monday, January 23, 2017, as Friday, January 20, 2017, was a federal holiday.  *See id.*  However, for some unknown reason, OFR scheduled it for publication on Tuesday, January 24, 2017.  Plaintiffs argue that "[t]his rule is not ambiguous[, and] 1 C.F.R. § 17.2 provides no room for agency discretion in its application," meaning OFR violated the regulation when it scheduled the 2017 Rule for publication one day later than the regulation required.  (*See* Pls.' Opp. at 39.)  As defendants argue, "Plaintiffs' alleged harm could have occurred regardless of the agency's supposed error."  (Mot. to Dismiss at 26.)  This is because even if the 2017 Rule had been scheduled for publication on Monday, January 23, 2017, as the

---

constituted a reviewable, final agency action, such an action would not be a violation of the APA.  As the Court concluded above, the 2017 Rule never became final.  Therefore, to shelve it indefinitely as "inactive" would require no process under the APA.

regulations required, the incoming administration still would have had time to request the rule's

withdrawal (as Friday, January 20, 2017 was the Inauguration Day).  Plaintiffs do not rebut

defendants' assertion that they have not demonstrated standing as to this claim.

Second, the Court agrees that plaintiffs' argument regarding 1 C.F.R. § 18.13 fails to

state a claim.  1 C.F.R. § 18.13, which provides for withdrawal of a rule after it has been posted

for public inspection, is as follows:

> A document that has been filed for public inspection with the Office of the
> Federal Register but not yet published, may be withdrawn from publication or
> corrected by the submitting agency. Withdrawals or minor corrections may be
> made with a timely letter, signed by a duly authorized representative of the
> agency. Extensive corrections may require agency withdrawal of the document
> from publication.

*Id.* § 18.13(a).  Plaintiffs argue that defendants violated this regulation because "OFR permitted

USDA to withdraw the [2017 Rule] for a reason other than error correction."  (Pls.' Opp. at 40.)

However, the text of the regulation belies such a narrow reading—the regulation provides that

rule may be "withdrawn from publication *or* corrected by the submitting agency." 1 C.F.R.

§ 18.13(a) (emphasis added).  Moreover, it provides no limitation on what the reasons for

withdrawal are.  The Court cannot conclude that by stating that "[e]xtensive corrections may

require agency withdrawal," *id.*, the regulation means that *only* extensive corrections provide

justification for withdrawal.  Rather, the agency simply recognized that some corrections may be

so extensive that they require withdrawal and re-submission, rather than a "timely letter" laying

out the "minor corrections."  *See Perry*, 940 F.3d at 1077 ("[R]egulations governing the Office

of the Federal Register generally permit an agency to withdraw a final rule even after it has been

submitted to the Office for publication, so long as the rule has not yet been published.").

Moreover, the Court concludes that such a reading does not violate either the APA or the

FRA.  As decided above, a rule is generally not final under the APA prior to its publication in the

Federal Register—as a result, withdrawal of such a rule prior to publication does not permit an agency to run afoul of APA procedures for repeal of finalized rules.  The FRA provides that the OFR "shall transmit immediately to the Government Publishing Office for printing" all rules it receives for publication.  *See* 44 U.S.C. § 1503.  Like the Court of Appeals in *Kennecott*, however, the Court agrees with defendants that permitting agencies to withdraw rules prior to publication "helps assure that regulations appearing in the Federal Register are as correct as possible in both form and substance," while also "impos[ing] discipline on agencies and on the OFR, thereby assuring that the work of publishing the government's regulations proceeds in an orderly fashion."  *See Kennecott*, 88 F.3d at 1206.  Again, the Court discerns no reason why release for public inspection should change the result here—while it does extend the period during which agencies may withdraw, such a period is still "relatively brief."  *See id.*  For example, under the regular publishing schedule, OFR regulations provide for one day between public inspection and publication.  *See* 1 C.F.R. § 17.2.  This regulation thus remains "consistent with the statute's purpose—establishing an orderly process for filing and publishing government regulations."  *Kennecott*, 88 F.3d at 1206.  As a result, plaintiffs' fourth claim also must be dismissed.

### B.    Horse Protection Act Claim

Lastly, plaintiffs argue that "[b]y repealing the [2017 Rule] and leaving in place the HPA Regulations long recognized as wholly inadequate to prevent horse soring, USDA and APHIS are acting contrary to the statutory mandate of the HPA to end horse soring and exceeding the authority granted by the HPA."  (Compl. ¶ 125.)  They point to the OIG Report and the findings that accompanied the 2017 Rule, both of which concluded that "the current regulations have failed to enforce the HPA."  (*See* Pls.' Opp. at 44.).  Because plaintiffs cannot "seek *wholesale*

improvement of [defendants'] program by court decree," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. at 891 (emphasis in original), this claim must also fail.

Plaintiffs argue that they are not attacking the government's HPA program in general, but have alleged a specific agency action that has caused them harm—repeal of the 2017 Rule.  But as the Court concluded above, the 2017 Rule was never finalized such that it required repeal.  As a result, plaintiffs' argument amounts to no more than the idea "that violation of the law is rampant" under the current HPA regulations.  *See id.*; (*see also* Defs.' Reply at 25 ("Plaintiffs' characterization is no more than an attempt to disguise a wholesale programmatic attack as something less than it is.")).  Under Supreme Court precedent, such a claim fails as a matter of law.  *See Lujan*, 497 U.S. at 891 (stating that a plaintiff "cannot seek *wholesale* improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." (emphasis in original)).

## CONCLUSION

For the foregoing reasons, the Court will grant defendants' motion to dismiss.  A separate Order accompanies this Memorandum Opinion.

ELLEN S. HUVELLE
United States District Judge

Date: July 27, 2020