**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HUMANE SOCIETY OF THE UNITED STATES, *et al.*, | |
| Plaintiffs, | Civil Action No. 19-cv-2458 (BAH) |
| v. | Judge Beryl A. Howell |
| UNITED STATES DEPARTMENT OF AGRICULTURE, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

Plaintiffs, animal welfare organizations and their members, initiated the instant action in August 2019 to challenge the Department of Agriculture's withdrawal in January 2017, of a rule filed for public inspection earlier that month.  *See* Compl., Ex. D, Letter from USDA Regul. Analysis & Dev. Chief Steve O'Neill to Off. of the Fed. Register Dir. Oliver Potts (undated) ("Repeal Action"), ECF No. 1-4.  The withdrawn rule would have overhauled the Department's enforcement of the Horse Protection Act, a law passed over fifty years ago to eradicate a practice called "soring" in which competitive show horses' legs are cut, burned, or otherwise hurt in order to alter their natural gait.  *See* Compl., Ex. B ("2017 Anti-Soring Enforcement Rule"), ECF No. 1-2; Compl. ¶¶ 1–10, ECF No. 1.[1]  Over the course of more than three years of litigation, the

---

[1]       Since the 2017 Anti-Soring Enforcement Rule was never published in the Federal Register, no single, authoritative version of the rule has been filed on the record in this case.  Plaintiffs' complaint attached, as Exhibit A, the version of this rule posted on the USDA Animal and Plant Health Inspection Service (APHIS) website as of August 13, 2019, and as Exhibit B, the version produced by APHIS in response to a Freedom of Information Act request by plaintiffs.  *See* Compl. at 3, n.1.  Defendants have cited Exhibit B when describing what they called the "Pre-Publication Rule" sent by USDA to the Office of the Federal Register in January 2017.  Defs.' Mot. Dismiss at 15, ECF No. 19-1.  For the sake of clarity, to the extent any differences exist between the two documents, the Court follows defendants in referring to Exhibit B of plaintiffs' complaint as the version of the 2017 Anti-Soring Enforcement Rule transmitted to the Office of the Federal Register.

district court first granted defendants' motion to dismiss, *Humane Soc'y of the United States v. USDA ("Humane Soc'y I")*, 474 F. Supp. 3d 320 (D.D.C. 2020) (Huvelle, J.), allowing the withdrawal and effective repeal of the 2017 Anti-Soring Enforcement Rule.[2]  Then, the D.C. Circuit reversed, holding that, although never published in the Federal Register, the 2017 Anti-Soring Enforcement Rule passed the "regulatory point of no return" upon its filing for public inspection and the agency's withdrawal without notice and comment was consequently unlawful. *Humane Soc'y of the United States v. USDA ("Humane Soc'y II")*, 41 F.4th 564, 568–75 (D.C. Cir. 2022).  With the agency's Repeal Action deemed unlawful, the only question now before this Court is whether the 2017 Anti-Soring Enforcement Rule, which should be in its sixth year of implementation, should be permitted, zombie-like, to spring to life by vacating the agency Repeal Action, or whether to maintain the status quo by remanding without vacatur, at least for some period of time.

Pending before this Court are five motions concerning this remedial phase of the litigation, grouped around two core issues.  First, shortly after the issuance of the D.C. Circuit mandate, the Tennessee Walking Horse National Celebration Association (the "Association") filed a motion to intervene, *see* Tennessee Walking Horse Nat'l Celebration Ass'n's Mot. Intervene ("Horse Ass'n's Mot. Intervene"), ECF No. 33; in the alternative, the Association moved to participate as amicus curiae, *see* Tennessee Walking Horse Nat'l Celebration Ass'n's Conditional, Unopposed Mot. File as Amicus Curiae, ECF No. 48.  Second, the Association, plaintiffs, and defendants have each filed cross-motions as to the proper remedy in this case, with

---

[2] This case was originally assigned to Judge Emmet Sullivan, then reassigned by consent on June 15, 2020 to Judge Ellen Huvelle.  Upon the issuance of the D.C. Circuit mandate, on December 14, 2022, the case was reassigned to the undersigned due to the retirement of Judge Huvelle.

plaintiffs arguing that the unlawful Repeal Action should be vacated, and defendants and the Association contending that remand without vacatur is the appropriate disposition.

For the reasons set forth below, the Association's motion to intervene is granted, and the Court determines that the proper remedy is remand, without vacatur, for USDA to take appropriate remedial action within 120 days.  If USDA fails to do so, the unlawful Repeal Action will be vacated, unless the agency demonstrates within ten days of the issuance of this decision compelling need for additional time.

## I.      BACKGROUND

The statutory and regulatory scheme underlying the parties' dispute is described below, followed by the relevant procedural history.  A fuller account of the history is set out in the prior district court opinion, *Humane Soc'y I*, 474 F. Supp. 3d at 324–26, and need not be repeated here in resolving the instant dispute regarding the appropriate remedy.

### A.      The Practice of Horse Soring

Gaited horse breeds exemplified by the Tennessee Walking Horse have long been admired for their "elegant, high-stepping strut that comes from both careful breeding and patient training."  Tennessee Walking Horse Nat'l Celebration Ass'n's Combined Mem. Opp. Pls.' Mot. Entry of J. & Supp. Remand Without Vacatur ("Horse Ass'n's Opp'n") at 8, ECF No. 46-1.[3] Each year, generally between March and November, the horses compete in a series of shows and

---

[3]      The memoranda filed in support of many of these motions are docketed twice and, to simplify citation, only one of the duplicate memoranda is cited.  For example, defendants' Memorandum in Support of Defendants' Combined Motion for Remand Without Vacatur and Opposition to Plaintiffs' Motion for Entry of Judgment is docketed twice, once at ECF No. 44 and once at ECF No. 45; only to the memorandum docketed at ECF No. 45 is cited.  Proposed intervenor-defendant Tennessee Walking Horse National Celebration Association filed its Combined Memorandum in Opposition to Plaintiffs' Motion for Entry of Judgment and in Support of Remand Without Vacatur twice, at ECF No. 46 and ECF No. 47, and only the memorandum docketed at ECF No. 46 is cited. Plaintiffs filed their Combined Reply in Support of Plaintiffs' Motion for Entry of Judgment and Opposition to Defendants' Motion for Remand Without Vacatur three times, with duplicates at ECF No. 51 and ECF No. 52, and a corrected version at ECF No. 53-1; only the memorandum docketed at ECF No. 53-1 is cited.

exhibitions that showcase the horses' distinctive walk.  *Id*.  The largest of these events for Tennessee Walking Horses is the National Celebration, an eleven-day event drawing more than 100,000 spectators to Shelbyville, Tennessee each year, where the "World Grand Champion" is crowned.  *Id*.  In preparation for these events, horses entered in the more dramatic "performance category" have typically trained with—and perform wearing—weights of six ounces or less on their legs, called action devices, and pads between their hooves and shoes.  *Id.* at 9.

The distinctive gait of the Tennessee Walking Horse and certain other show horses that is prized in the show rings can be developed through time-and-labor-intensive training, but—as abusive trainers have discovered—the sought-after gait may more expediently be created by inflicting severe pain on the horse's feet or legs, a practice euphemistically called "soring."  *See id.* at 8–9.  This method typically involves the application of a blistering agent, such as mustard oil, to the horse's legs, which are then wrapped with so-called "action devices," such as chains, beads, or metal rollers, to aggravate further the pain during the horse's performance and causing the horse so subjected to these techniques to avoid placing weight on the injured legs.  *See* Compl. ¶¶ 49, 71; H.R. Rep. No. 91-1597, at 2 (1970).  The effect is to exaggerate the high-stepping gait cultivated among these show horses.  The pads that horses are often trained with can also be used for soring; for example, abusive trainers use the pads to hide items, such as bolts and other hard objects, that apply painful pressure to the soles of the horses' hooves, resulting in the same effect of pain-optimized performance, *see* Compl. ¶ 71; *see also* Horse Protection; Licensing of Designated Qualified Persons and Other Amendments, 81 Fed. Reg. 49,112, 49,120 (proposed July 26, 2016) (to be codified at 9 C.F.R. pt. 11).  Soring "can make a mediocre horse perform like a champion," but this abuse comes at the cost of the horses' well-being, as well as fair competition in the gaited horse show industry.  H.R. Rep. 91-1597.

### B.      Regulatory Background

Over fifty years ago, in 1970, Congress launched the federal government's campaign to end the practice of horse soring with the passage of the Horse Protection Act.  The Act prohibited the showing or exhibition of sored horses, and defined soring as causing pain or inflammation to horses in order to affect their natural gaits by methods including the use of blistering or chemical agents, infliction of burns or lacerations, and "any other cruel or inhumane method or device."  Horse Protection Act of 1970, Pub. L. No. 91-540, at § 2(a)(1)–(4), 84 Stat. 1404 (1970).  The Act also authorized USDA to conduct inspections to prevent soring, but due to its minimal resources and lax enforcement methods, USDA's inability to make a dent on the industry's pervasive soring practices quickly become apparent.  In hearings before Congress in 1975, USDA estimated that it would only be able to inspect 20 out of the 3,600 horse shows scheduled for the 1976 fiscal year—reaching only the "tip of the iceberg" of soring violations. H.R. Rep. No. 94-1174, at 5–6 (1976).

In response, Congress amended the Horse Protection Act in 1976, empowering USDA to create the private enforcement scheme that presently remains in practice.  *See* Horse Protection Act Amendments of 1976, Pub. L. No. 94-360, 90 Stat. 915 (1976).  The regulations promulgated pursuant to the 1976 amendments set out a system by which the horse industry would regulate itself, appointing so-called horse industry organizations that sponsor horse shows to train and license "Designated Qualified Persons" ("DQPs"), who may be veterinarians or any "knowledgeable horsemen."  Definition of Terms and Certification and Licensing of Designated Qualified Persons, 44 Fed. Reg. 1558 (1979); *accord* Certification and Licensing of Designated Qualified Persons (DQP's), 9 C.F.R. § 11.7(a)(1)–(2), (b) (2022).  DQPs are tasked with inspecting horses for evidence of soring at horse shows and sales, disqualifying sored horses and issuing violations to the owners.  *See* 9 C.F.R. § 11.7; Responsibilities and Liabilities of

Management, 9 C.F.R. § 11.20 (2022).  USDA's involvement in this otherwise-self-policing system is to certify training programs and to send its own veterinarians on unannounced trips to evaluate DQPs' performance.  9 C.F.R. § 11.7.  Otherwise, the horse industry organizations are in charge and responsible for licensing, training, and hiring the DQPs, as well as overseeing the internal penalty schemes and appeal procedures for violations.  *Id.*; *see also* U.S. Department of Agriculture Office of the Inspector General, Audit Report 33601-2-KC, *Animal and Plant Health Inspection Service Administration of the Horse Protection Program and the Slaughter Horse Transport Program* at 1–2 (Sept. 2010).

The self-regulating regime was apparently overly optimistic that the horse show industry could or would effectively protect horses from troubling and unfair soring practices.  In a 2010 report, USDA's Office of the Inspector General ("USDA-OIG") concluded that the self-regulating regime had failed to achieve its intended purpose and recommended that the Animal and Plant Health Inspection Service (APHIS) of USDA abolish the program.  *Id.* at 3.  The system was determined to be hamstrung by conflicts of interest: the DQPs are often horse exhibitors themselves, who are motivated to turn a blind eye to violations by their peers— particularly when their employers, the horse show management, would prefer not to disqualify horses.  *Id.* at 2.  When inspectors did examine the horses effectively enough to find violations, some deliberately issued violation tickets to people other than the horses' exhibitors to protect the exhibitors from incurring a penalty.  *Id.*  From 2005 to 2008, although APHIS veterinarians were present at only 6 percent of shows, those were the shows that accounted for 49 percent of all violations issued by DQPs, *id.,* strongly suggesting that the self-regulatory scheme worked most effectively when agency inspectors were present.

The 2017 Anti-Soring Enforcement Rule originated as a belated response to the USDA-OIG report demonstrating the failings within the horse show industry to police itself.  This Rule displaces the self-policing model with a centralized enforcement approach, assigning the authority to license, train and monitor veterinarians and veterinary technicians as independent DQPs—to be known instead as "Horse Protection Inspectors" ("HPIs")—to APHIS alone.  *See generally* 2017 Anti-Soring Enforcement Rule, ECF No. 1-2.  The Rule also takes the significant step of prohibiting all action devices and non-therapeutic pads.  After five public hearings, an extension of the rule's comment period, and more than 130,000 written comments, USDA posted the final rule on its website and transmitted the rule to the Office of the Federal Register, which made it available for public inspection on January 19, 2017, and scheduled publication of the rule in the Federal Register for January 24, 2017.  *Humane Soc'y II*, 41 F.4th at 566–67.

The 2017 Anti-Soring Enforcement Rule, however, was never published in the Federal Register.  On Inauguration Day, January 20, 2017, the Chief of Staff to new President Donald Trump issued a memorandum directing all agencies to withdraw any rule provided to the Office of the Federal Register not yet published in the Federal Register.  As a result, the day before the 2017 Anti-Soring Enforcement Rule was set to be published, USDA asked the Office of the Federal Register to withdraw this rule from the public docket and withhold publication.  *See* Compl. ¶¶ 95–96; Repeal Action.  The 2017 Anti-Soring Enforcement Rule proceeded to whither on the vine: USDA added the rule to a list of "inactive" rulemakings,  *Humane Soc'y I*, 474 F. Supp. 3d at 326, and in December 2021, after the district court had dismissed this suit, USDA published in the Federal Register a withdrawal of the 2016 Notice of Proposed Rulemaking, citing the need to update the 2017 Anti-Soring Enforcement Rule based on findings regarding horse soring identification techniques published in a 2021 National Academy of Sciences study.

Defs.' Mem. Supp. Cross-Mot. Remand Without Vacatur & Opp'n to Pls.' Mot. Entry of J.

("Defs.' Opp'n") at 10, ECF No. 45 (citing Horse Protection; Licensing of Designated Qualified

Persons and Other Amendments, 86 Fed. Reg. 70,755 (Dec. 13, 2021)).[4]

Over six years have now passed since the 2017 Anti-Soring Enforcement Rule was

unlawfully withdrawn in 2017, with the horse show industry's self-policing regime continuing

intact over a decade after the revelations in the USDA-OIG report about the inherent

inadequacies of that system. In the interim, USDA has created a new Notice of Proposed

Rulemaking to address horse soring, which is currently undergoing review by the Office of

Information and Regulatory Affairs ("OIRA"). *See* Defs.' Opp'n at 11.

---

[4]     The National Academy of Sciences study, titled *A Review of Methods for Detecting Soreness in Horses*, made a series of findings that bear directly on USDA's regulations enforcing the Horse Protection Act. *See* National Academy of Sciences, *A Review of Methods for Detecting Soreness in Horses* (2021) ("NAS Report"), https://nap.nationalacademies.org/catalog/25949/a-review-of-methods-for-detecting-soreness-in-horses. First, the report "strongly recommend[ed] that use of DQPs for inspections be discontinued and that only veterinarians, preferably with equine experience, be allowed to examine horses," NAS Report at 42. The report further urged that any third-party inspectors be trained by USDA, rather than the industry, and screened for conflicts of interest—a recommendation "in line with the rule proposed by APHIS in 2016 that was finalized in 2017 but not yet implemented." *Id.* In addition, the report made a number of recommendations regarding techniques to detect pain in horses, such as updating training regarding equine pain behavior and reinstituting the use of thermography to detect soring, *see id.* at 43, 70.
     Among its recommendations, the report dedicated a chapter to explaining the need for revision of what is called the "Scar Rule" in the Horse Protection Act regulations. The Scar Rule, originally added in 1979 and not revised since then, presumes a horse to be sored if an inspector observes abnormalities in the horse's leg tissue, namely, "bilateral granulomas," or other evidence of inflammation. Scar Rule, 9 C.F.R. § 11.3 (2022). According to the report, the Scar Rule's language is so outdated and lacking in clear terms as to be "not enforceable." NAS Report at 83. The rule was designed to permit inspectors to identify visually lesions on horses' legs that indicate soring, but the report found no evidence that granulomas in particular are present in the lesions of sore horses—nor even that inspectors can detect such granulomas with the naked eye. *Id.* Even the name of the rule is no longer appropriate, because sored horses' lesions have become more subtle in the intervening decades since 1979, resulting in lesions that still violate the scar rule without evidencing any scars. *Id.* at 83–84. Consequently, the report recommends a wholesale revision of the Scar Rule. The 2017 Anti-Soring Enforcement Rule made no changes to the long-standing Scar Rule; nonetheless, USDA's 2021 withdrawal notice noted the NAS Report's findings regarding the Scar Rule—among other "science-based recommendations regarding revisions to APHIS' Horse Protection Act program"—to conclude that the 2017 Anti-Soring Enforcement Rule did not adequately address the NAS Report's findings. *See* Horse Protection; Licensing of Designated Qualified Persons and Other Amendments, 86 Fed. Reg. 70,755 (Dec. 13, 2021) (withdrawing 2016 Notice of Proposed Rulemaking).

### C.       Procedural Background

On August 13, 2019, plaintiffs filed this lawsuit to challenge USDA's withdrawal of the

2017 Anti-Soring Enforcement Rule, alleging that this Rule "could not be repealed without

public notice first proposing such repeal, explaining the rationale for it and providing the

opportunity for public comment."  Compl. at 3.  The district court granted the defendants'

motion to dismiss, holding that the 2017 Anti-Soring Enforcement Rule was not a final rule and

could be withdrawn without undergoing a formal repeal process.  *Humane Soc'y I,* 474 F. Supp.

3d 320.  On July 22, 2022, the D.C. Circuit reversed the lower court's ruling, holding that a rule

"passes [a] regulatory point of no return" when it is made available for public inspection, as

occurred with the 2017 Anti-Soring Enforcement Rule.  *Humane Soc'y II,* 41 F.4th at 568–570.

Consequently, "agencies may repeal a rule made available for public inspection in the Office of

the Federal Register only after complying with the APA's procedural requirements," a

requirement that USDA failed to satisfy "when it withdrew its final rule without providing notice

and an opportunity for comment or invoking a statutory exemption."  *Id.* at 575.  In dissent,

Judge Rao expressed consternation about the appropriate remedy, noting that most of the rule

had an effective date of January 1, 2018.  *See id.* at 584 (Rao, J., dissenting) ("If USDA

unlawfully withdrew its horse soring rule in 2017, what happens next?  Does the district court

have authority to compel USDA to resubmit its 2017 rule to the Federal Register? . . . If the 2017

rule is published, may USDA enforce the rule against private parties stretching back to the

original effective date?").  The majority, in response, urged that Judge Rao's "hand-wringing

about the remedy in this case has a simple answer: the case is like any other in which an agency

repeals a rule without notice and comment and a court holds that it was wrong to do so," citing

*Env't Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 818 (D.C. Cir. 1983), which held that a rule's

failure to be subject to notice and comment resulted in its vacatur.  41 F.4th at 575.

9

USDA then filed a petition for panel rehearing, which was denied on December 5, 2022.

*Humane Soc'y of the United States v. USDA ("Humane Soc'y III")*, 54 F.4th 733 (Mem.) (D.C.

Cir. 2022).  The agency petition requested that the panel "delete" the passage regarding the

appropriate remedy in this case and instead "indicate that it expresses no view about the

appropriate remedy," arguing that remand without vacatur is appropriate.  *See* Pet. for Panel

Rehr'g at 2, *Humane Soc'y of the United States v. USDA*, Case No. 20-5291 (D.C. Cir. Oct. 6,

2022).  In denying the petition, the D.C. Circuit ordered that "[o]n remand, the district court may

consider all remedial issues, including the question of whether remand to the agency without

vacatur is appropriate under the criteria established by Circuit precedent."  54 F.4th at 734.  In

concurrence, Judges Tatel and Millett noted that USDA's "modest request makes sense given

that the Department is in the late stages of developing a rule addressing the same topic as the

2017 rule, a fact the district court can consider when determining the proper remedy."  *Humane*

*Soc'y III*, 54 F.4th at 734.[5]

Upon issuance of the D.C. Circuit's mandate, the Tennessee Walking Horse National

Celebration Association—the convening organization of the annual Tennessee Walking Horse

National Celebration—filed a motion to intervene on remand before this Court, ECF No. 33,

which plaintiffs opposed, ECF No. 41, and upon which the agency defendants took no position,

ECF No. 40.  Later, the Association filed an unopposed, conditional motion to file a brief as

amicus curiae if its motion to intervene were denied, ECF No. 48.  Plaintiffs then filed a motion

seeking remand with vacatur of the unlawful Repeal Action withdrawing the 2017 Anti-Soring

---

[5]      The same order denied the Tennessee Walking Horse National Celebration Association's motion to intervene, over Judge Rao's dissent, with the concurrence concluding that the Association's motion came too late. 54 F.4th at 734.  Emphasizing that the D.C. Circuit only grants motions to intervene at the appeal stage in "exceptional case[s] for imperative reasons," *id.* at 735 (Tatel, J., concurring) (quoting *Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, 771 F.2d 1551, 1552 (D.C. Cir. 1985) (per curiam)), the concurrence noted that the Association has "long been on notice that its interests were not the same as the Department's . . . [and] [i]t is not for the Association to now second guess the Department's strategy by intervening," *id.*

Enforcement Rule, ECF No. 42.  In response, defendants filed a combined motion for remand, without vacatur of the withdrawal, and opposition to plaintiffs' motion, ECF No. 45, and the Association filed its own cross-motion for remand without vacatur, ECF No. 46.  All five motions are now ripe.

## II.    LEGAL STANDARD

### A.    Intervention

Federal Rule of Civil Procedure 24 provides that "[o]n timely motion," the Court "must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  FED. R. CIV. P. 24(a)(2).  To qualify for intervention as of right, four requirements must be satisfied: "1) timeliness of the application to intervene; 2) a legally protected interest; 3) that the action, as a practical matter, impairs or impedes that interest; and 4) that no party to the action can adequately represent the potential intervenor's interest."  *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 320 (D.C. Cir. 2015); *see also Karsner v. Lothian*, 532 F.3d 876, 885 (D.C. Cir. 2008).  A movant failing to meet the requirements to intervene as a matter of right may nonetheless be allowed permissive intervention, pursuant to Rule 24(b), if the movant "[o]n timely motion . . . has a claim or defense that shares with the main action a common question of law or fact."  FED. R. CIV. P. 24(b)(1)(B).[6]

---

[6]     "The standing inquiry for an intervening-defendant [by right] is the same as for a plaintiff: the intervenor must show injury in fact, causation, and redressability."  *Crossroads Grassroots Policy Strategies*, 788 F.3d at 316.  While it remains "an open question in this [C]ircuit whether Article III standing is required for permissive intervention," *Defs of Wildlife v. Perciasepe*, 714 F.3d 1317, 1327 (D.C. Cir. 2013), plaintiffs do not contest the Association's standing in this case, *see generally* Pls.' Opp'n Tennessee Walking Horse Nat'l Celebration Ass'n's Mot. Intervene ("Pls.' Opp'n Horse Ass'n's Mot. Intervene"), ECF No. 41.  Indeed, the Association's standing is evidenced by this organization's status as an entity regulated by USDA's enforcement of the Horse Protection Act.

B.        **Remand With or Without Vacatur**

Upon reaching the conclusion that agency actions are unlawful and void, vacatur is the "normal remedy," *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014), and the "ordinary result" is that the actions are set aside in full,  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).  "[I]n limited circumstances," however, courts have discretion to "remand without vacating the agency's action," *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020)—a remedial technique pioneered by the D.C. Circuit and recently described as "a useful arrow in a court's remedial quiver,"  *Am. Public Gas Ass'n v. U.S. Dep't Energy*, 22 F.4th 1018, 1030 (D.C. Cir. 2022).  Whether remand without vacatur is appropriate is guided by consideration of the so-called *Allied-Signal* factors: first, of "'the seriousness of the action's deficiencies' and, second, the 'likely disruptive consequences of vacatur.'"  *Am. Great Lakes Ports Ass'n*, 962 F.3d at 518 (quoting *Allina Health*, 746 F.3d at 1110) (cleaned up); *accord Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (formalizing the practice of remanding without vacatur in this Circuit).

III.    **DISCUSSION**

The Association's motion to intervene is addressed first, followed by discussion of the appropriate remedy in this case.

---

Plus, the Association has represented that the immediate enforcement of the 2017 Anti-Soring Enforcement Rule would "effectively make it impossible to stage" the organization's annual National Celebration.  Horse Ass'n's Mot. Intervene at 14.  According to the Association, vacatur of the Repeal Action would cause those injuries, and remanding without vacatur would prevent them.  *Id*. at 16–17.

## A.   Intervention by the Tennessee Walking Horse National Celebration Association

The Association has moved to intervene as of right under Federal Rule of Civil Procedure 24(a), seeking to participate "for the limited purpose of addressing the appropriate remedy in this new phase of the case and not to reopen any previously litigated issues." Horse Ass'n's Mot. Intervene at 17. As already noted, defendants take no position on the Association's intervention, *see* Defs.' Resp. Horse Ass'n's Mot. Intervene, ECF No. 40, but plaintiffs oppose on grounds that the motion is untimely and, in any case, USDA adequately represents the organization's interests in this limited proceeding. Pls.' Opp'n Tennessee Walking Horse Nat'l Celebration Ass'n's Mot. Intervene ("Pls.' Opp'n Horse Ass'n's Mot. Intervene"), ECF No. 41. The Association has the better of this argument and shall be permitted to intervene in the case. The two disputed prongs of the intervention-by-right analysis are addressed in turn.[7]

### 1.   *Timeliness*

Timeliness "is to be judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Amador Cnty. v. U.S. Dep't of Interior*, 772 F.3d 901, 903 (D.C. Cir. 2014) (citations omitted). Courts "do not require timeliness for its own sake." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014). Rather, the timeliness factor is "aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Id.* The "most important

---

[7]   The second and third factors of the analysis—that the Association has a legally protected interest and the action threatens to impair that interest—support the Association's intervention, as plaintiffs implicitly concede, *see* Pls.' Opp'n Horse Ass'n's Mot. Intervene at 15–23, and for the same reasons that confer standing upon the entity in this case, *see supra* n.6.

consideration," then, is whether any delay in intervention unfairly prejudices the existing parties. *Id* at 152.[8]

Undoubtedly, the Association *could* have sought to intervene in the original district court proceedings in this case. Plaintiffs have sought vacatur of the Repeal Action from the very first filing in this lawsuit in 2019, ringing the bell of the Association's core interests. *See* Compl. at 44–45 (requesting that the Court enter judgment "[v]acating USDA's repeal of the Final Rule"); Pls.' Opp'n Horse Ass'n's Mot. Intervene at 17–18. USDA did not clearly represent the Association's interests at the outset of the litigation—a fact only underlined by the Association's failed attempt to intervene to seek *en banc* review of the D.C. Circuit's ruling when USDA declined to do so. *See Humane Soc'y III,* 54 F.4th at 734; *see also id.* at 735 (Tatel, J. concurring) (noting that the "Association has long been on notice that its interests were not the same as the Department's, a government agency bound to represent the 'interests of the American people'" (quoting *Fund for Animals v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003))). Even where a would-be intervenor "*could* have intervened earlier," however, it does not necessarily follow that it "*should* have intervened earlier." *Roane*, 741 F.3d at 152.

---

[8]     Plaintiffs urge that "the most important circumstance relating to timeliness" is in fact whether the proposed intervenor "sought to intervene as soon as it became clear that [the proposed intervenor's] interests would no longer be protected by the parties in the case," Pls.' Opp'n Horse Ass'n's Mot. Intervene (quoting *Cameron v. EMW Women's Surgical Ctr.*, 142 S. Ct. 1002, 1012 (2022) (cleaned up)). This partial quote from *Cameron* in no way abrogates D.C. Circuit precedent's focus on unfair prejudice as the key inquiry. In *Cameron*, the Supreme Court granted the Kentucky Attorney General's motion to intervene, when the motion was filed only two days after the state's cabinet secretary of Health and Family Services declined to continue defending the state's law concerning abortion procedures. Since "the timeliness of [the Attorney General's] motion should be assessed in relation to that point in time," the motion to intervene was found not to be untimely. 142 S. Ct. at 1012–13. The import of this finding is that filing a motion to intervene as soon as an intervenor realizes its interests are not adequately protected may be sufficient to meet the timeliness requirement—but this is neither the sole nor necessary measure of timeliness. Here, the Association does not even argue about whether its intervention motion was filed at the earliest possible moment; rather, its argument hinges on whether any delay in intervening would cause unfair prejudice to the existing parties.

The critical consideration—unfair prejudice—weighs decisively in favor of the Association's motion.  After the D.C. Circuit issued its mandate, the Association filed its intervention motion even before the parties began briefing the remedial issue, and it has complied with the court-ordered briefing schedule by submitting a proposed cross-motion and reply brief alongside defendants.  This posture distinguishes the Association's motion to intervene from cases cited by plaintiffs, such as *Amalgamated Transit Union Int'l, AFL-CIO v. Donovan*, where a proposed-intervenor's motion to intervene to seek further review of an appellate decision was filed nearly two months after the decision's issuance, and thus would have "denied [the existing parties] any meaningful opportunity to respond to any new arguments."  771 F.2d 1551, 1553 (D.C. Cir. 1985).  Consideration of the Association's briefs would add no additional time to resolution of this proceeding.  Further, the Association expressly denied any intent to "relitigate any matters that have already been decided," but seeks only to address the matter of remedies.  Horse Ass'n's Mot. Intervene at 18.  Such express disclaimers have effectively mitigated concerns about prejudice to parties from permitting intervention after substantial litigation on the merits was already underway.  *See, e.g., Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972) (granting union members' motion to intervene after trial, where "the proposed intervenors expressly disavowed any desire to reopen any previously-litigated question, and sought only to participate in the remedial, and if necessary the appellate, phases of the case"); *Natural Resources Def. Council v. Costle*, 561 F.2d 904, 908 (D.C. Cir. 1977) (granting intervention at remedial stage where proposed intervenors "did not seek to reopen the settled issues in the case but sought to participate in an upcoming, remedial phase of the litigation"); *cf. Campaign Legal Ctr. v. Fed. Election Comm'n*, Case No. 21-cv-406 (TJK), 2022 WL 1978727, *3 (D.D.C. June 6, 2022) (denying motion to intervene seeking to

15

reopen settled issues in the case, and noting that when "purpose of [intervention] is more 'limited' or forward looking," courts are more likely to grant the motion (quoting *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1294 (D.C. Cir. 1980))).  As a result, the existing parties will not be unfairly prejudiced by any delay in resolution as a result of the Association's participation.

Plaintiffs' attempt to identify prejudice in the nature of the Association's arguments, which they claim "convert this narrow remedial litigation into a full-scale attack on the validity of the Final Rule," Pls.' Opp'n Horse Ass'n's Mot. Intervene at 18, is overblown.  To be sure, the Association contends that the 2017 Anti-Soring Enforcement Rule is defective, *see* Horse Ass'n's Mot. Intervene at 25, but the points raised in this argument are also relevant to the *Allied-Signal* analysis's second factor regarding the disruptive effects of vacatur.  To the extent that the 2017 Anti-Soring Enforcement Rule is now outdated, as USDA also notes, *see* Defs.' Opp'n at 10–11, this threatens to make vacatur of the Repeal Action more disruptive due to the likelihood that, if permitted to spring into effect, the former rule would be quickly stayed or altered, whether via litigation or agency action.  Although the same arguments might be levied in an action claiming the 2017 Anti-Soring Enforcement Rule is arbitrary and capricious, the versatility of the Association's critiques does not somehow transform the nature of this remedial phase of this case.

Finally, contrary to plaintiff's contentions, the "law of the case" does not dictate that the Association's motion is untimely.  Pls.' Opp'n Mot. Intervene at 12.  The D.C. Circuit denied the Association's first motion to intervene in a distinct context, applying the "appellate stage" standard of only granting motions to intervene in "exceptional case[s] for imperative reasons," *Humane Soc'y III*, 54 F.4th at 735 (Tatel, J., concurring) (quoting *Amalgamated Transit Union*

16

*Int'l, AFL-CIO*, 771 F.2d at 1552).  That standard is not applicable here.  Further, the timeliness

analysis includes consideration of "the purpose for which intervention is sought" and "the

probability of prejudice," *Amador Cnty.*, 772 F.3d at 903—two factors that look starkly different

at this remedial stage.  In contrast to the Association's prior purpose of "second guess[ing]"

defendants' strategy by seeking further review, *Humane Soc'y III*, 54 F.4th at 735, the

Association now seeks to participate in an entirely new stage of this litigation.  While the

Association's entry at the appeal stage would have delayed this litigation as this intervenor

sought *en banc* review, entry as an intervenor at this stage does not threaten to prejudice the

parties unfairly.  The panel's decision to exclude the Association from joining this litigation at

the appellate stage does not control the pending motion to intervene in this remedial proceeding.

      Accordingly, the Association's motion is sufficiently timely.

      **2.**    ***Adequacy of Representation***

      A potential intervenor need only show that "representation of his interest may be

inadequate; and the burden of making that showing should be treated as minimal."  *Fund for

Animals*, 322 F.3d at 735 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10

(1972)).  This requirement is "not onerous."  *Crossroads Grassroots Pol'y Strategies*, 788 F.3d at

321 (quoting *Fund for Animals*, 322 F.3d at 735); *accord Berger v. North Carolina State

Conference of NAACP,* 142 S. Ct. 2191, 2203–04 (2022).  In addition, the D.C. Circuit has

traditionally "look[ed] skeptically on government entities serving as adequate advocates for

private parties."  *Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 321.

      The Association has surmounted its low burden of demonstrating that USDA may not

adequately protect its interests.  True, in the context of this narrow remedial phase, the

Association and USDA propose exactly the same remedy—remand of the Repeal Action without

vacatur—and for the same reasons: first, the potentially disruptive consequences of vacatur, and second, USDA's progress in promulgating an updated rule based on recent scientific advancements, including the findings of the 2021 National Academy of Sciences study that were not available at the time of the 2017 Anti-Soring Enforcement Rule's drafting.  *See* Defs.' Opp'n at 13–19; Horse Ass'n's Mot. Intervene at 23–26.  Still, USDA is not able to "afford the movant's discrete and particularized interests the same primacy as movants would themselves," *Navistar, Inc. v. Jackson*, 840 F. Supp. 2d 357, 362 (D.D.C. 2012) (citations and quotations omitted), given that the best providers of information regarding the effect of the snap-enforcement of the 2017 Anti-Soring Enforcement Rule are the regulated entities themselves, including the Association.[9]  Further, "[a]lthough the intervenor and the government entity involved in the litigation frequently may agree on a legal position or course of action, the D.C. Circuit nonetheless 'often [has] concluded that governmental entities do not adequately represent the interests of aspiring intervenors.'" *100Reporters LLC v. U.S. Dep't of Justice*, 307 F.R.D. 269, 279 (Contreras, J.) (D.D.C. Dec. 3, 2014) (quoting *Fund for Animals*, 322 F.3d at 736). This is because the entities' interests could always diverge later on in the course of the litigation; after all, as a general matter, the interests of USDA and the Association, which is regulated by the former, obviously diverge.  USDA represents the public; in contrast, the Association represents its members, who face significant financial stakes in the outcome of this litigation, and

---

[9]     Defendants' briefs on the question of remedy lay bare USDA's limited capacity to represent the Association's interests at stake.  In portraying the potentially disruptive consequences of vacatur, USDA focuses on the potential regulatory confusion, harm to horses of having their high pads removed suddenly, the difficulties that USDA would face in training new inspectors quickly, and the drain on USDA's resources of enforcing the 2017 Anti-Soring Enforcement Rule while simultaneously focusing on promulgating an updated rule.  Defs.' Opp'n at 13–19.  Nowhere do defendants detail the immediate adverse impact that vacatur would have on regulated entities like the Association, such as the elimination of an estimated 70 percent of the horses shown at the Association's National Celebration, and the 2017 Anti-Soring Enforcement Rule's rendering of the Association's subsidiary Horse Industry Organization practically defunct overnight, *see* Horse Ass'n's Mot. Intervene at 14–15.

even "the extinction of the sport" of showcasing Tennessee Walking Horses, Horse Ass'n's Mot.

Intervene at 24. *See Humane Soc'y III*, 54 F.4th at 735 (Tatel, J., concurring) (noting that "[i]n

representing the public, [USDA] may favor different arguments than a private third party").

Here, those fundamentally distinct interests may result in USDA and the Association taking

different views as to whether and how to appeal this Court's ruling—the exact crack in interests

that already appeared on appeal.  Thus, the last of the Rule 24(a)(2) requirements is satisfied,

because defendants may not adequately represent the Association's interests at this stage of the

litigation.

Accordingly, the Association may intervene "for the limited purpose of addressing issues

related to remedy."  Horse Ass'n's Mot. Intervene at 18.[10]

## B.    Vacatur of the 2017 Rule's Withdrawal

The parties agree that the *Allied-Signal* factors control the analysis of whether remand

with or without vacatur is the appropriate remedy in light of the D.C. Circuit's ruling that the

2017 Anti-Soring Enforcement Rule was unlawfully withdrawn.  *See* Pls.' Mem. Supp. Mot.

Entry J. ("Pls.' Mem."), ECF No. 42 at 17–18; Defs.' Opp'n at 12–13; Horse Ass'n's Opp'n at

6–7.  Plaintiffs assert that the Repeal Action withdrawing this rule must be vacated, because the

repeal's failure to go through notice-and-comment was a "fundamental flaw," and vacatur would

be unlikely to cause sufficiently "disruptive consequences."  Pls.' Mem. at 10, 18–24.  In

contrast, defendants and the Association argue that remand without vacatur is appropriate under

the same factors, emphasizing the "novel disruptive consequences" that would result from the

2017 Anti-Soring Enforcement Rule's sudden resurrection.  Defs.' Opp'n at 13.  From

---

[10]    Consequently, the Association's alternative arguments for permissive intervention, pursuant to Fed. R. Civ.
P. 24(b)(1)(B), Horse Ass'n's Mot. Intervene at 26–27, or for the Association to be permitted to participate as
amicus curiae, *see* Tennessee Walking Horse Nat'l Celebration Ass'n's Conditional, Unopposed Mot. File as
Amicus Curiae, ECF No. 48, need not be addressed and may be denied as moot.

defendants' and the defendant-intervenor's perspective, the immediate enforcement of this Rule would likely shutter this year's show season and harm horses accustomed to the currently-legal devices—all for the temporary enforcement of a rule that USDA acknowledges has fallen behind scientific developments in detecting horse soring, and which the agency is already working to update with new rulemaking.  Defs.' Opp'n at 13–20; Horse Ass'n's Opp'n at 6–7.

### 1.    The Severity of the Withdrawal's Deficiencies

The first *Allied-Signal* factor weighs in favor of vacatur due to the severity of the Repeal Action's deficiencies.  Generally, when an agency's reasoning is found to be legally deficient, but there is "at least a serious possibility that the [agency] will be able to substantiate its decision on remand," vacatur is not necessary.  *Allied-Signal*, 988 F.2d at 151.  In those instances, the fix may be a simple matter of adding additional explanations for its decision, *see, e.g., Heartland Regional Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009), or correcting a citation that erroneously rooted the agency's authority in an expired statute, *see Air Transport Ass'n of America, Inc. v. U.S. Dep't of Agriculture*, 317 F. Supp. 3d 385, 391–92 (D.D.C. 2018).  Such substantive errors do not necessarily give rise to "doubt whether the agency chose correctly," *Allied-Signal,* 988 F.2d at 150.  *See also Am. Public Gas Ass'n*, 22 F.4th at 1031 (describing a "failure[] to explain" as "the type of deficiency most readily remedied on remand").

Procedural deficiencies in the rule-making process, however, are categorically different. "[F]ailure to provide the required notice and to invite public comment—in contrast to the agency's failure . . . adequately to explain why it chose one approach rather than another for one aspect of an otherwise permissible rule—is a fundamental flaw that normally requires vacatur of the rule."  *Natural Resources Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020) (quoting *Heartland Regional Med. Ctr.*, 566 F.3d at 199).  *See also Allina Health*, 746 F.3d 1110–1111

20

(describing deficient notice as "almost always" requiring vacatur).  An agency's failure to abide

by notice-and-comment procedures is so severe because this flaw in the decision-making process

creates a baked-in deficiency of information and democratic engagement that cannot be

retroactively ameliorated.  Without engaging in notice-and-comment procedures, the agency's

action "lacks the legitimacy that comes with following the APA-mandated procedures for

creating binding legal obligations."  *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d

240, 268 (D.D.C. 2015) (Moss, J.); *see also* Pls.' Mem. at 18–19; Pls.' Corrected Reply Supp.

Mot. Entry of J. & Opp'n Defs.' Mot. Remand Without Vacatur ("Pls.' Opp'n") at 11 n.1, ECF

No. 53-1.  Consequently, "[w]hen an agency bypasses a fundamental procedural step, the vacatur

inquiry asks not whether the ultimate action could be justified, but whether the agency could,

with further explanation, justify its decision to skip that procedural step."  *Standing Rock Sioux

Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021).[11]  Otherwise,

agencies would be incentivized to rule first and seek public comment later, thereby subverting

the democratic and outcome-improving purposes of this procedural step.  *See AFL-CIO v. Chao*,

496 F. Supp. 2d 76, 91 (D.D.C. 2007) (describing procedural requirements such as notice-and-

comment as "serv[ing] the salutary purposes of (1) 'ensur[ing] that agency regulations are tested

via exposure to diverse public comment, (2) ensur[ing] fairness to affected parties, and (3)

---

[11]     For this reason, the Association's contention that "it is more than merely *likely* that the USDA will be able
to fix its error on remand and reach the same result" is based on a flawed understanding of this *Allied-Signal* factor.
Horse Ass'n's Opp'n at 17–18.  The Association argues that, given USDA's withdrawal of the 2017 Anti-Soring
Enforcement Rule in 2021 based on the agency's desire to consider updates with new scientific developments,
conducting the required notice-and-comment would surely result in the rule's withdrawal.  As *Standing Rock Sioux
Tribe* makes clear—a case that, perplexingly, *no party* has addressed—the proper question for a procedural
deficiency is whether USDA could justify its decision to skip notice-and-comment procedures when withdrawing
the rule.  985 F.3d at 1052.  The answer to that question is resounding silence by defendants.
        The Association's approach is fatally flawed, not only for ignoring D.C. Circuit precedent, but also for
rewarding bad behavior.  An agency confident that notice-and-comment procedures would eventually favor
withdrawal of a rule—particularly if the lack of notice-and-comment results in remand after litigation, which builds
in time for the rule to grow stale, as was the case here—would have little incentive to comply with procedural
requirements, but instead could withdraw rules without procedural guardrails first, and then, if caught, conduct
notice-and-comment to justify those decisions retroactively after courts remand without vacatur.

[giving] affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.'" (quoting *Int'l Union, United Mine Workers of America v. Mine Safety and Health Admin*., 407 F.3d 1250, 1259 (D.C.Cir.2005))).

USDA's failure to follow notice-and-comment procedures when withdrawing the 2017 Anti-Soring Enforcement Rule was undoubtedly a serious deficiency, seeding substantial doubt that the agency "chose correctly" in its action. *Allied-Signal,* 988 F.2d at 150. Indeed, defendants never contend that "the agency could, with further explanation, justify its decision to skip [notice-and-comment]," *Standing Rock Sioux Tribe*, 985 F.3d at 1052. *See generally* Defs.' Opp'n; Defs.' Reply Supp. Mot. Remand Without Vacatur ("Defs.' Reply"), ECF No. 57. Instead, the agency emphasizes the unique posture of this case's procedural defect. *See* Defs.' Opp'n at 18–19. In the majority of cases cited by plaintiffs to support vacatur, agencies failed to engage in notice-and-comment procedures before *promulgating*, rather than *withdrawing*, a rule. *See* Pls.' Mem. at 18–19 (citing cases in which failure to engage in notice-and-comment before promulgating rule resulted in vacatur). In many of those cases, vacatur would simply result in a reversion to the regulatory status quo before the rule's promulgation. Here, because the unlawful action was a recission, the opposite is true: remand *without* vacatur maintains the status quo. This buttresses the agency's argument that vacatur would be disruptive under the second prong of the *Allied-Signal* analysis, but is misplaced in assessing the first prong concerning the seriousness of the deficiency. Put another way, defendants falter in asserting that merely maintaining the status quo without vacatur makes the agency's deficiency in rule-making any less serious, *see* Defs.' Reply at 3–4—a conclusion that simply does not follow.

### 2.     *Disruptive Consequences*

The second *Allied-Signal* factor requires courts to consider "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–51 (quoting *Int'l Union, United Mine Workers of America v. Federal Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)).  Where courts have found that vacatur would be particularly disruptive, they have remanded without vacatur even when the deficiency was an omission of notice and comment.  This decision is "based on equitable considerations."  *Organic Trade Ass'n v. U.S. Dep't of Agriculture*, Case No. 17-cv-1875 (PLF), 2022 WL 951335, *8 (D.D.C. March 30, 2022).  *See also Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019) ("Neither factor is dispositive, as 'there is no rule requiring either the proponent or opponent of vacatur to prevail on both factors.'" (quoting *Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 270)).  In *Sugar Cane Growers Co-op of Fla. v. Veneman*, for example, the USDA implemented a program—without notice-and-comment rulemaking—by which sugar beet farmers could submit bids offering to destroy a certain amount of their crops in exchange for sugar in USDA storage.  In holding that the program was procedurally defective, the D.C. Circuit emphasized that the program had already been launched, and "the crops were plowed under," such that "[t]he egg has been scrambled and there [was] no apparent way to restore the status quo ante," 289 F.3d 89, 97–98 (D.C. Cir. 2002).  *See also Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1190–91 (D.C. Cir. 2018) (affirming remand, without vacatur, where agency failed to give timely, statutorily-required notice, both because of the defect's "relative insignificance" and the otherwise likely disruptive consequences); *Williams v. Walsh*, Case No. 21-cv-1150 (RC), 2022 WL 17904227, at *18 (D.D.C. Dec. 23, 2022) (remanding, without vacatur, rule promulgated without notice-and-comment due to significant disruptive

consequences otherwise); *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) (remanding, without vacatur, where EPA failed to provide adequate notice and comment on the issue of administrative exemptions to a hazardous waste reporting requirement because the exemptions' removal "may affect the EPA's ability to respond adequately to serious safety hazards"); *Am. Medical Ass'n v. Reno*, 57 F.3d 1129, 1135–36 & n.4 (D.C. Cir. 1995) (remanding, without vacatur, where DEA issued rule increasing registration fees for handlers of controlled substances without adequate notice-and-comment procedures, given that vacating the fee rules would cause "obvious hardship" for the DEA, and any improper overcollection could be easily made up through future adjustment, but urging the DEA to "act with due haste" to remedy its errors).

Vacatur of the Repeal Action resulting in withdrawal of the 2017 Anti-Soring Enforcement Rule would be severely disruptive across the board: for the regulated horse show industry, the horses the Horse Protection Act seeks to safeguard, and the agency.  This disruption does not merely arise because the 2017 Anti-Soring Enforcement Rule is, as USDA intended, a major overhaul of the regulatory regime.  Nearly all aspects of this Rule, as filed for public inspection, would have gone into effect approximately one year after the rule's scheduled publication, on January 1, 2018.  *See* 2017 Anti-Soring Enforcement Rule at 3.  Vacating the withdrawal now, more than five years after the Rule's date of effectiveness, would cause its immediate resurrection and "would instantly put the entire industry out of compliance and make it impossible even to conduct the 2023 show season."  Horse Ass'n's Opp'n at 17; *see also* Defs.' Opp'n at 13–14.  *Cf. Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, (D.D.C. 2017) (vacating rule's delay where consequences would not be "particularly disruptive").  Such a vacatur "makes little sense" when this would cause a rule to "immediately spring into effect . . .

24

causing many regulated entities to instantly go out of compliance, without the lead time the . . .
rule envisioned." *Organic Trade Ass'n*, 2022 WL 951335, at *9 (quotation marks and brackets
omitted).  The loss of the lead-time contemplated by the year-long implementation period in the
2017 Anti-Soring Enforcement Rule affects the industry in at least two major ways.

First, the 2017 Anti-Soring Enforcement Rule would have permitted industry-overseen
DQPs to continue conducting inspections up until January 1, 2018, providing a year for new
HPIs to be trained and licensed in time for the 2018 show season.  *See* Horse Ass'n's Opp'n at
23–25.  Allowing this Rule to spring into effect immediately without this lead-time would result
in *no soring inspectors at all* until HPIs have been trained and licensed under the Rule—a
process that would have to begin from scratch.  *See* Defs.' Opp'n at 15 (representing that "USDA
certainly did not begin to operationalize the new inspector training and licensing programs").  As
a result, as the Association contends, the immediate applicability of this part of the Rule would
"effectively require canceling the 2023 season."  Horse Ass'n's Opp'n at 25.

Second, the 2017 Anti-Soring Enforcement Rule delayed the prohibition on pads until
January 1, 2018.  *See* Defs.' Opp'n at 15.  The pad ban effectively outlaws the "performance
categories" of competition encompassing the vast majority of horses entered in shows like the
National Celebration.  Horse Ass'n's Opp'n at 25.  Vacating the Repeal Action would result in
the sudden disqualification of the majority of horses at such events, without providing trainers or
show organizers sufficient lead-time to attempt to re-train their performance category horses or
re-organize the show line-ups.  *Id.* at 25–26.  Further, immediately banning all pads "would be
harmful to some horses currently on high pads," particularly those horses whose feet were
trimmed in conjunction with the use of pads.  Defs.' Opp'n at 15 (quoting Compl., Exhibit A
("2017 Pre-Publication Rule") at 102, ECF No. 1-1).  The 2017 Anti-Soring Enforcement Rule

was designed to permit trainers to reduce the horses' pad sizes gradually so that the horses' hooves could grow back naturally, reducing the stress placed on the horses.  *Id.*

Plaintiffs do not address these anticipated repercussions to the show industry and horses, arguing that "[i]f complying with the Final Rule would require a scramble for USDA or the Association, it is only because they have chosen to delay compliance, even while dragging out this litigation."  Pls.' Opp'n at 17, ECF No. 53-1.  Plaintiffs are correct that the D.C. Circuit ruled in July 2022 that the 2017 Anti-Soring Enforcement Rule had been withdrawn without undertaking required notice-and-comment procedures.  To plaintiffs' point, USDA could have acted promptly in the last ten months to cure the deficiency either by taking steps to repeal the 2017 Anti-Soring Enforcement Rule in accord with appropriate administrative procedures or prioritizing a new rulemaking to update that Rule.  Still, regulated entities cannot be reasonably expected to alter their conduct dramatically to anticipate the vacatur of the withdrawal while the remedy remains pending—particularly without any cue from USDA.

Finally, immediate vacatur of the Repeal Action would disrupt USDA's ongoing effort to issue a new Notice of Proposed Rulemaking that is intended to "incorporate[] more recent findings and recommendations, including" the 2021 National Academy of Sciences study.  Defs.' Opp'n at 16 (quoting 86 Fed. Reg. 70,755).[12]  When USDA purported to withdraw the 2017 Anti-Soring Enforcement Rule in December 2021, the agency explained that, reviewing the rule "in light of the NAS report," the agency "determined that the rule does not sufficiently address the report's findings," and further that, given the time that has passed since the rule's publication, the agency "would likely need to update the underlying data and analyses that

---

[12]     As of February 2023, defendants represented that the draft Notice of Proposed Rule Making remained under review by the Office of Information and Regulatory Affairs (OIRA), and was not yet public.  Defs.' Opp'n at 11.

supported the proposed rule." 86 Fed. Reg. 70,755. The Court need not find that the 2017 Anti-Soring Enforcement Rule is legally defective or invalid to note the obvious imprudence of subjecting the regulated industry to a rule that USDA itself describes as insufficient in addressing the findings of the NAS report.[13] Vacatur would be unnecessarily disruptive where the effect would force the regulated entities to dramatically alter their conduct in compliance with what is likely to be only a temporary rule.

In light of the "disruptive consequences of an interim change that may itself be changed," *Allied-Signal*, 988 F.2d 146, 150–51, remand without vacatur is the proper remedy here. "An open-ended remand without vacatur, however, can create a new problem: The agency may have little or no incentive to fix the deficient rule," a potential consequence that both "common sense and the empirical literature confirm." *Am. Public Gas Ass'n,* 22 F.4th at 1030. "Therefore, it may sometimes be prudent to require an agency to fix a deficient rule by a time certain, at which the rule will automatically be vacated." *Id.* This approach balances the risk of "agency indifference" with the harms of immediate vacatur. *In re Core Comms., Inc.,* 531 F.3d 849, 862 (Griffith, J., concurring). *See also Am. Public Gas Ass'n*, 22 F.4th at 1031 (remanding final rule to agency to "take appropriate remedial action within 90 days," and ordering the Final Rule to be automatically vacated if the agency fails to do so); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (leaving rule in place for 90 days, at which time the rule would be vacated

---

[13] The Association cites the NAS Report to conclude that, because "the 2017 Rule suffers from a glaring defect," it is a "virtual certainty" that USDA would withdraw the 2017 Anti-Soring Enforcement Rule if it were to conduct notice-and-comment procedures now. Horse Ass'n's Opp'n at 19– 20; *see also* Horse Ass'n's Reply Supp. Remand Without Vacatur at 10–13, ECF No. 56. As already explained, *see infra* Part III.B.1, the Association mistakes the relevant inquiry under the *Allied-Signal* factors. Plaintiffs, for their part, argue that, because the 2017 Anti-Soring Enforcement Rule did not alter the Scar Rule, which has remained the same since 1979, the Scar Rule will remain in place whether or not the Repeal Action is vacated, calling the Association's argument a "total red herring." *See* Pls.' Opp'n at 9, 18–21. The parties overcomplicate the effect in this proceeding of the NAS Report and USDA's resultant attempted withdrawal of the proposed rule, since consideration of both the Report and agency action simply demonstrate that the 2017 Anti-Soring Enforcement Rule is "an interim change that may itself be changed." *Allied-Signal*, 988 F.2d 146, 150–51.

if the agency failed to correct the rule's defect); *Rodway v. USDA*, 514 F.2d 809, 817–18 (D.C Cir. 1975) (remanding without vacatur but requiring the USDA to complete a new rule-making process within 120 days where, as here, the rule at issue was procedurally defective).  A time-certain for continuation of the status quo on remand to the agency also addresses plaintiffs' concern that USDA's new rulemaking is "completely speculative."  Pls.' Opp'n at 8.

Accordingly, an intermediate course is appropriate here: the Court will remand without vacatur, but the 2017 Anti-Soring Enforcement Rule will take automatic effect after 120 days if the agency fails to take appropriate remedial action.[14]  This will allow the agency to attempt to promulgate the updated version of the rule that is currently in rule-making process, or otherwise to remedy the deficiency in the withdrawal of the 2017 Anti-Soring Enforcement Rule by conducting notice and comment on the withdrawal, while ensuring that the agency gets busy quickly. At the same time, this delay of four months in vacatur of the Repeal Action reduces the regulatory whiplash suffered by the regulated industry that a remand with vacatur would otherwise invite, and puts a finite time period in place, as plaintiffs suggested, *see supra* n.14, to guard against agency inaction.

## IV.    CONCLUSION

For the foregoing reasons, USDA's unlawful withdrawal of the 2017 Anti-Soring Enforcement Rule is remanded without vacatur, but vacatur will automatically occur after 120 days if the agency fails to take appropriate remedial action.  Accordingly, the Association's motion to intervene, ECF No. 33, is GRANTED, while the Association's motion to participate as amicus curiae in the alternative, ECF No. 48, is DENIED.  Plaintiffs' motion for entry of

---

[14] Plaintiffs' suggestion that the Court remand with vacatur, but stay vacatur until July 22, 2023—one year after the D.C. Circuit decision that USDA was required to undertake notice-and-comment procedures before withdrawal of the 2017 Rule—may be too short a period of less than three months.  *See* Pls.' Opp'n at 10.

judgment, ECF No. 42, defendants' cross-motion for remand without vacatur, ECF No. 45, and the Association's cross-motion for remand without vacatur, ECF No. 46, are all GRANTED IN PART AND DENIED IN PART.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 12, 2023

_____
BERYL A. HOWELL
U.S. District Judge